[No. A054559. First Dist., Div. One. Jan. 20, 1993.]

STATE WATER RESOURCES CONTROL BOARD et al., Plaintiffs and Appellants, v.
OFFICE OF ADMINISTRATIVE LAW, Defendant and Respondent;
BAY PLANNING COALITION, Real Party in Interest and Appellant.

## COUNSEL

Daniel E. Lungren, Attorney General, Roderick E. Walston, Assistant Attorney General, Walter E. Wunderlich, Assistant Attorney General, and Clifford T. Lee, Deputy Attorney General, for Plaintiffs and Appellants.

Washburn, Briscoe & McCarthy, David Ivester and Thiele R. Dunaway for Real Party in Interest and Appellant.

John D. Smith and Herbert F. Bolz for Defendant and Respondent.

Ronald A. Zumbrun, Robin L. Rivett and James S. Burling as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**STEIN, J.**—The State Water Resources Control Board (State Board) and the Regional Water Quality Control Board for the San Francisco Bay Region

(Regional Board) appeal from a judgment insofar as it denied their petition for writ of mandate seeking to overturn a determination by the Office of Administrative Law (OAL).[1] The Bay Planning Coalition, which had initiated the matter by seeking the OAL determination, cross-appeals from the judgment insofar as it denied the coalition declaratory and injunctive relief.

### FACTUAL AND PROCEDURAL BACKGROUND

The State Water Resources Control Board is responsible for the administration of California's water resources. Under the Porter-Cologne Water Quality Control Act (Porter-Cologne Act) (Wat. Code, § 13000 et seq.), regional boards are to "establish such water quality objectives in water quality control plans as in [their] judgment will ensure the reasonable protection of beneficial uses and the prevention of nuisance." (Wat. Code, § 13241.) The plans are then submitted to the State Board for approval. In August 1987, the Regional Board adopted certain amendments to the water quality control plan for the San Francisco Basin, including wetland protection provisions. The State Board approved these amendments in September 1987.

The Bay Planning Coalition is a nonprofit California corporation whose members include San Francisco Bay Area municipalities, port authorities, and private property owners. In May 1988, the Bay Planning Coalition contacted the OAL, requesting a determination that the amendments are regulations which may not be adopted without following the procedures set forth in the Administrative Procedure Act (APA). (Gov. Code, §§ 11340 et seq., 11370.)[2] The State and Regional Boards—which had not followed those procedures in adopting the amendments—opposed the Bay Planning Coalition's request. The Boards conceded that the amendments were in fact regulatory, but argued that they are not governed by the APA. The OAL, however, issued a determination finding, first, that the amendments are regulations and, second, that their adoption violated Government Code section 11347.5, subdivision (a), which prohibits agencies from adopting regulations without following the APA's procedures.

The Boards filed a petition for writ of mandate in the superior court, seeking to vacate the OAL's ruling, and to obtain a determination that when

---

[1]The Boards have requested that we take judicial notice of the ruling of the Sacramento Superior Court in Simpson Paper Co. v. State Water Resources Control Board (1992, No. 364016). We have done so (Evid. Code, §§ 452, 459) but do not consider that opinion in reaching our decision.

[2]Among the OAL's powers is the power to determine if a "guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule," is a regulation which must be adopted pursuant to the procedures set forth in the APA. (Gov. Code, § 11347.5, subd. (b).)

formulating and adopting water quality control plans, the Boards are not required to comply with the provisions of the APA regarding the adoption of regulations. The Bay Planning Coalition filed a cross-petition for writ of mandate seeking, as relevant here, a declaration that regulatory matters in water quality control plans are regulations, and a permanent injunction directing the Boards to comply with and implement the APA when adopting regulations, particularly the basin plan amendments at issue.

On May 29, 1991, the superior court issued its judgment, finding that the amendments are regulations, that they are not exempt from the APA, and that the OAL properly so determined. The court therefore denied the Boards' petition for writ of mandate. The court also denied the Bay Planning Coalition's cross-petition.

THE APPEAL

I.

*The Amendments Are Regulations*

 Much of the Boards' opening brief is devoted to the argument that the amendments at issue are not truly regulations. In resolving this issue we exercise our independent review. (*Grier* v. *Kizer* (1990) 219 Cal.App.3d 422, 434 [268 Cal.Rptr. 244].) It is also true, however, that "While the issue ultimately is one of law for this court, 'the contemporaneous administrative construction of [a statute] by those charged with its enforcement and interpretation is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized. [Citations.]' [Citations.]" (*Ibid.*) The Legislature has conferred upon the OAL the power to determine if administrative directives are in fact regulations. (Gov. Code, § 11347.5.) The OAL has made such a determination as to the portions of the water quality control program at issue here.

In any event, there is no real question but that the amendments meet the APA's definition of regulations, and the Boards do not contend otherwise.[3] Indeed, as noted, the Boards conceded to the OAL that the amendments are regulatory, and that water quality control plans—such as the plan amended

---

[3]Government Code section 11342 provides: "(b) 'Regulation' means every rule, regulation, order, or standard of general application or the amendment, supplement or revision of any such rule, regulation, order or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one which relates only to the internal management of the state agency. 'Regulation' does not mean or include legal rulings of counsel issued by the Franchise Tax Board or State Board of

in the present case—are quasi-legislative.[4] They argue, however, that an analysis of the Porter-Cologne Water Quality Control Act indicates that the Legislature intended to define these regulatory, quasi-legislative provisions as something other than regulations. We disagree.

The Legislature established the OAL as a central office with the power and duty to review administrative regulations. The Legislature expressed its reasons in no uncertain terms stating, in essence, that it was concerned with the confusion and uncertainty generated by the proliferation of regulations by various state agencies, and that it sought to alleviate these problems by establishing a central agency with the power and duty to review regulations to ensure that they are written in a comprehensible manner, are authorized by statute and are consistent with other law. (Gov. Code, §§ 11340, subd. (e), and 11340.1.) In order to further that function, the relevant Government Code sections are careful to provide OAL authority over regulatory measures whether or not they are designated "regulations" by the relevant agency. In other words, if it looks like a regulation, reads like a regulation, and acts like a regulation, it will be treated as a regulation whether or not the agency in question so labeled it. In light of this strong legislative mandate, concededly regulatory agency directives—such as the amendments to the water quality control plan at issue here—must be deemed regulations.

The Boards, however, argue that a close reading of the Water Code demonstrates a legislative intent that even regulatory aspects of water quality control plans be deemed something other than "regulations" under the Government Code. In the Boards' view, and notwithstanding the breadth of Government Code section 11342, the Legislature never intended that the definition of "regulation" encompass water quality control plans. (This argument must be distinguished from the Boards' second argument, discussed *post*, that although the plans fit the definition of regulations, this court should find that they are impliedly exempted from the statutes governing regulations.) The Boards point out that various statutes contain rules

---

Equalization, or any form prescribed by a state agency or any instructions relating to the use of the form, but this provision is not a limitation upon any requirement that a regulation be adopted pursuant to this part when one is needed to implement the law under which the form is issued."

[4] The Boards framed the issue before the OAL as follows: "The question before the Office of Administrative Law ('OAL') is not whether the amendments are regulatory. The State Board concedes that the Water Quality Control Plan for the San Francisco Basin and all other water quality control plans adopted pursuant to Porter-Cologne set regulatory standards of general applicability which apply, interpret and make specific the requirements of Porter-Cologne. Water quality control plans are quasi-legislative. The water quality objectives and implementation program established by a water quality control plan are binding standards, not mere goals or guidelines."

relating to either water quality programs or to regulations, or to both, and draw from this the conclusion that the Legislature must have viewed them as separate matters. The argument, in our opinion, is little more than the assertion that if the Legislature had intended a particular regulatory directive to be deemed a "regulation," it would have said so. That assertion is soundly refuted by those provisions of the APA, such as Government Code section 11347.5, which provide that anything regulatory is a regulation whether or not so labeled by the agency. The Water Code may label one type of regulatory directive a regulation and another type a water quality control plan, but for purposes of complying with the APA, they are both regulations. We do agree, however, that water quality control programs are not synonymous with regulations.[5] A water quality control plan may or may not contain a regulation. A regulation relating to water control may or may not be contained in a water quality control program. That the two are not synonymous, however, does not alter the fact that a regulation which is part of a water quality control program is a regulation under the APA. We feel secure that had the Legislature intended that the Water Code contain two classes of regulatory matters: (1) regulatory aspects of water quality control programs, and (2) all other agency directives, it would have said so, and said so unequivocally. We find support in this conclusion in the fact that in specifically exempting other regulatory matters from the APA (e.g., Gov. Code, §§ 11351 and 11342.5; see, also, Lab. Code, § 1185, and Pub. Resources Code, § 30620, subd. (a)(3), together with § 30333), the Legislature has demonstrated its awareness of a need for a separate class of regulation and has acted expressly to address that need.

II.

*Regulations Contained Within Water Quality Control Programs Are Not Exempted From the APA*

Water quality control programs are not expressly exempted from the APA. The Boards do not argue otherwise. The Boards argue, however, that there are irreconcilable conflicts between the Porter-Cologne Act and the APA, which require a determination that any regulations in the former are impliedly exempted from the latter.

Initially, if recognized at all, implied exemptions are disfavored. Government Code section 11346 provides: "It is the purpose of this article to

---

[5]Water Code section 13050, subdivision (j) defines water quality control plans, specifying that such a plan "consists of a designation or establishment for the waters within a specified area of all of the following: [¶] (1) Beneficial uses to be protected [¶] (2) Water quality objectives [¶] (3) A program of implementation needed for achieving water quality objectives."

establish basic minimum procedural requirements for the adoption, amendment or repeal of administrative regulations. Except as provided in Section 11346.1, the provisions of this article are applicable to the exercise of any quasi-legislative power conferred by any statute heretofore or hereafter enacted, but nothing in this article repeals or diminishes additional requirements imposed by any such statute. The provisions of this article shall not be superseded or modified by any subsequent legislation *except to the extent that such legislation shall do so expressly.*" (Italics added.) Although section 11346 was added in 1980, after the adoption of the Porter-Cologne Act, it simply restates the provisions of Government Code former section 11420, which predated the act. The statutory language could hardly be clearer. It therefore overcomes the otherwise applicable rule that a special statute controls a general statute. (*Engelmann* v. *State Bd. of Education* (1991) 2 Cal.App.4th 47, 59 [3 Cal.Rptr.2d 264].) We do not agree with the Boards' argument that section 11346 somehow impermissibly limits or restricts the power of the Legislature. If the Legislature desires to permit implied exemptions, it can amend section 11346 to so provide. Nor are we persuaded that section 11346 means something other than what it says because other courts may have recognized implied exemptions to the APA in unusual circumstances,[6] or because the Legislature has not expressly stated otherwise. As to the last of these arguments, the Legislature has settled the issue by stating that unless expressly exempted, all administrative regulations must comply with the APA.

Moreover, we do not see the kind of "irreconcilable conflict" here that might support a finding of implied exemption. That the Porter-Cologne Act establishes similar procedures is not persuasive. The APA was enacted to establish basic minimum procedural requirements. (*Grier* v. *Kizer, supra,* 219 Cal.App.3d at p. 431.) Agencies are free to adopt additional procedural

---

[6]The case providing the Boards the most support is *Alta Bates Hospital* v. *Lackner* (1981) 118 Cal.App.3d 614 [175 Cal.Rptr. 196]. In that case the court, without discussing Government Code Section 11346, held that the history of Welfare and Institutions Code section 14120, plus the need for the Director of the State Department of Health to take emergency measures, mandated a finding that such measures do not fall within the APA. The case stands for the proposition that an implied exemption from the APA procedures may be found (1) where there is a compelling reason for forgoing the APA procedures, and (2) where the legislative history of a statute indicates an intent to create an exemption which is not expressed in the relevant statute. Neither factor exists here. In *Americana Termite Co.* v. *Structural Pest Control Bd.* (1988) 199 Cal.App.3d 228 [244 Cal.Rptr. 693], the court simply concluded that the agency's procedures for determining which termite companies and inspectors to investigate were not regulations. (*Id.* at p. 233.) Similarly, in *Skyline Homes, Inc.* v. *Department of Industrial Relations* (1985) 165 Cal.App.3d 239 [211 Cal.Rptr. 792], the court found no more than that an agency's interpretation of a regulation is not a regulation itself. (*Id.* at p. 253.)

requirements (Gov. Code, § 11346). Therefore, the mere fact that the Porter-Cologne Act has its own procedural requirements does not, in and of itself, create a conflict.

The Boards, however, find an irreconcilable conflict in the APA's notice requirements and the Porter-Cologne Act's approval requirements. The APA requires that notice of a proposed action must be mailed at least 45 days prior to the hearing and to the close of public comment on the action. (Gov. Code, § 11346.4, subd. (a).) The notice must be accompanied by a copy of the proposed action and a statement of the reasons for proposing the action. (Gov. Code, § 11346.7, subd. (a).) For practical purposes this means that a proposed action cannot be conclusively acted upon until at least 45 days have passed from the date of notification. Water Code section 13246, however, provides that "The state board shall act upon any water quality control plan within 60 days after the regional board has submitted such plan to the state board, or 90 days after resubmission of such plan." It follows that the State Board has 15 days after the 45-day period for public comment, etc., in which to act on the proposal. The Boards argue that the State Board will not have enough time to incorporate or consider public comment before it is required to act. (The Boards point out that under tit. 1, Cal. Code Regs., § 5, it is required to submit notices to the OAL 10 days before the date of publication, thus creating a 55-day notification period and shortening to 5 days the time between the close of that period and the time in which it must act.) There is, however, no irreconcilable conflict. The short time in which to act may make matters more difficult for the State Board, and may require the State Board to consider public opinion prior to the expiration of the 45-day period and to incorporate and amend during, rather than solely after, the 45-day period, but it does not render the State Board's task impossible.

The Boards next complain that it may become impossible to amend a regulation. Water Code section 13245 provides that the State Board may approve a plan proposed by a regional board "or return it to the regional board for further consideration and resubmission to the state board." Water Code section 13246 gives the State Board 90 days to act after resubmission of a plan. Such a time limitation, it is claimed, places the State Board in an impossible position. Under Government Code section 11346.8, subdivision (c), the public must receive notice of any change made by an agency to the original text. If the change is not substantial, or is "sufficiently related" to the original text, the public requires only 15 days' notice. If the change is not sufficiently related to the original text, however, the public presumably requires the same notice as is required of original text, i.e., 45 (or 55) days. The Boards' argument is not completely clear, but it appears to be that the

State Board might return a proposed plan to the Regional Board which would then resubmit it to the State Board, triggering the 90-day time period for State Board action and also triggering a 55-day notice requirement under the Government Code. The state would wait that 55 days and then might determine to amend the proposed plan without resubmitting it to the Regional Board. For a significant amendment, the State Board would be required to give the public another 55 days' notice, for a total notice period of 110 days after the Regional Board resubmitted the plan. Thus, although the State Board is required to act on a resubmitted plan within 90 days, it might also be required to give the public a total of 110 days' notice.

The superior court found, and we agree, that this potential problem would be met if instead of amending a resubmitted plan on its own, the State Board again sent it back to the Regional Board, which could again resubmit it and trigger a new 90-day period. The Boards claim that such action provides no solution because "A water quality control plan returned to the Regional Boards would still have to be ratified by the State Board, thus raising the same deadline conflicts present in the original State Board review of the plan." The conflict, however, becomes impossible only so long as the State Board continues to significantly amend resubmitted plans. Presumably, at some point a plan resubmitted by the Regional Board will be sufficiently satisfactory as to permit the State Board to simply ratify it 55 days after notice is given to the public, and well within the 90-day requirement of Water Code section 13246.

In conclusion we, as did the OAL and superior court, conclude that regulatory matters contained in water quality control plans are in fact regulations and that such regulations are neither expressly nor impliedly exempt from the provisions of the APA. We further conclude, as the Boards have conceded, that the amendments at issue here are regulatory and thus that the trial court correctly determined that their adoption had to comport with the requirements of the APA.

### III.

### *The New Legislation*

Although they have no direct bearing on the present case, we note that past and present legislation supports our conclusion.

In 1988, the State Board proposed legislation which, if adopted, would have added Water Code section 13148, providing, "State policy for water quality control adopted or revised pursuant to this article and water quality

control plans and guidelines adopted, approved or revised by the state board pursuant to Section 13170, 13245 or 13245.5 are not subject to [chapter 3.5] (commencing with Section 11340) of Division 3 of Part 1 of Title 2 of the Government Code. [I.e., the APA.]" Similarly, in 1991, Assembly Bill No. 88 was introduced, which, if adopted, would have added section 13148, providing in part, "(c) The adoption or revision of state policy for water quality control and water quality control plans and guidelines pursuant to this article, . . . are not subject to Chapter 3.5 (commencing with Section 11340) of Division 3 of Part 1 of Title 2 of the Government Code." Neither piece of proposed legislation was adopted. It could be inferred that the Legislature does not wish to exempt water quality control programs from the APA.

On September 28, 1992, the Governor signed Assembly Bill No. 3359. Assembly Bill No. 3359 amends sections of the APA providing, essentially, that any new water quality control programs must comply with the APA and that any undisputed plans already in place will not be invalidated retroactively for lack of APA compliance. (See Gov. Code, § 11353, subds. (a) and (b).) As to water quality control plans currently in dispute, Government Code section 11354 provides that the new legislation does not affect any court's determination as to the applicability of the APA to the procedures for adoption of water quality control plans "in a civil action which was pending on June 1, 1992." Thus, the new legislation also will not require APA compliance in any pending action in which a court has determined that compliance is not required.

This legislation, of course, has no effect on the present case, involving a pending action determining that water quality control plans *are* subject to the APA. It does, however, tend to confirm that our opinion that compliance should be required is in accord with the legislative intent. We read the new legislation as rejecting the State Board's proposals to expressly exempt water quality control plans from the APA, and as clarifying existing law as making APA compliance mandatory.

### THE CROSS-APPEAL

The Bay Planning Coalition complains that the trial court declined to declare that the State and Regional Boards must comply with the APA when adopting regulations, and that the water quality control plan provisions at issue here are subject to the APA and not exempt therefrom. It further complains that the court did not direct the Boards to comply with the APA.

The validity or invalidity of the water quality control plan amendments, however, have not yet been determined. They are regulations and must be

implemented as regulations. We see no particular reason to conclude that they will not be so implemented. Further, there are no allegations that the Boards' actions have caused, or threaten to cause, injury to any particular person or entity. It follows that there is no controversy requiring declaratory or injunctive relief. ■ As stated by the court in *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170-171 [188 Cal.Rptr. 104, 655 P.2d 306], in discussing the concept of ripeness: " 'The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. [Citation.] It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. . . .' [¶] . . . Without undertaking to survey the intricacies of the ripeness doctrine it is fair to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way."

The judgment is affirmed. Each party shall bear its own costs on appeal.

Strankman, P. J., and Newsom, J., concurred.

A petition for a rehearing was denied February 19, 1993.