[No. A117494. First Dist., Div. One. Mar. 21, 2008.]

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE et al., Plaintiffs and Appellants, v.
STATE WATER RESOURCES CONTROL BOARD et al., Defendants and Respondents.

## COUNSEL

Gregory C. Loarie and Deborah S. Reames for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, James Humes and Tom Greene, Chief Assistant Attorneys General, Mary E. Hackenbracht, Assistant Attorney General, John Davidson and William Jenkins, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

**SWAGER, J.**—We review in this appeal the trial court's denial of appellants California Sportfishing Protection Alliance and DeltaKeeper Chapter of BayKeeper's petition for writ of mandate, which challenged respondents State Water Resources Control Board (State Board) and state Regional Water Quality Control Board–Region 5's (Regional Board) 2006 adoption and approval of the Deer Creek temperature amendment to the existing Water Quality Control Plan for the Sacramento and San Joaquin River Basins (the

Basin Plan or plan). Appellants claim that the amendment violates the provisions of the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.)[1] (Porter-Cologne Act) and the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). In approving the temperature amendment to the Basin Plan, appellants argue respondents made findings on the beneficial uses of Deer Creek that are not supported by the evidence in the administrative record, and failed to comply with environmental review requirements that are the functional equivalent of CEQA. We conclude that the findings challenged by appellants are supported by the evidence, and respondents did not violate administrative regulations governing the environmental review of a basin plan by a certified regulatory program. We therefore affirm the order.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Deer Creek, the subject of this litigation, is a small tributary stream in a watershed in the lower woodlands of the Sierra Nevada foothills in El Dorado and Sacramento Counties. It flows through residential neighborhoods and parks into a small reservoir at Cameron Park Lake, over a low flashboard dam, past a wastewater treatment plant, then across predominantly undeveloped agricultural land to its confluence with the Cosumnes River near the town of Elk Grove. It is a typical Sierra Nevada foothill stream. Runoff from seasonal rains rather than snowpack supplies Deer Creek in the rainy season, but beginning in May or June the flow subsides or ceases above Cameron Park Lake. Below the lake an intermittent or subterranean flow in summer and fall is derived from reservoir overflow, springs, effluent, and urban runoff. Like the Cosumnes River, during many years Deer Creek primarily "runs dry" for much of the summer season.

In 1974, the El Dorado Irrigation District (the District) constructed the Deer Creek Wastewater Treatment Plant in the watershed of Deer Creek, not far below Cameron Park Lake. Absent the discharge from the wastewater treatment plant, Deer Creek is an "ephemeral stream" during the dry season, so the effluent discharge helps to provide flow for aquatic habitat. Tertiary treated effluent from the wastewater treatment plant constitutes the vast majority of the flow of Deer Creek—90 percent or more—below the point of discharge during the summer and fall months, and for most of the year appreciably exceeds the natural water temperature in the creek. During the "precipitation period" of the year, effluent discharges constitute a much smaller but erratic fraction of the downstream flows, and natural conditions

---

[1] All further statutory references are to the Water Code unless otherwise indicated.

often provide adequate background flow to maintain hydraulic continuity with the Cosumnes River. The relative magnitude of temperature increase in Deer Creek due to the effluent discharges is highly variable from month to month and year to year, depending upon precipitation, variation in creek flow rates, ambient air temperatures, and other factors.

In accordance with the mandates of the Porter-Cologne Act, in 1975 respondents adopted a water quality control plan for the Sacramento and San Joaquin River basins, which, as amended in 1989, 1994, and 1998, established water quality objectives for Deer Creek.[2] In general, the Basin Plan stated that the primary goal of water quality planning is the protection and enhancement of existing and potential designated beneficial uses, achieved by setting quality and quantity objectives for surface and groundwaters. Under the "tributary rule," the "beneficial uses" designated in the Basin Plan for the Cosumnes River, and hence for Deer Creek as a "cold freshwater aquatic habitat," included municipal and domestic supply, irrigation and stock watering, recreation, preservation of warm and cold freshwater habitats as necessary to support aquatic vegetation or wildlife, and the migration, spawning and reproduction of aquatic organisms.

To maintain and protect cold freshwater beneficial uses, the Basin Plan, prior to the amendment challenged in the current proceeding, provided that "[a]t no time or place shall the temperature of COLD or WARM intrastate waters be increased more than 5 degrees F above natural receiving water temperature." This prohibition against a discharge that raised the water temperature more than 5 degrees Fahrenheit—referred to as the "delta 5°F requirement" or the "5°F increase limitation"—was generic to "all water bodies" in the basin, and did not specifically protect Deer Creek. The Basin Plan also stated that the "natural receiving water temperature of intrastate waters shall not be altered unless it can be demonstrated to the satisfaction of the Regional Water Board that such [alteration] in temperature does not adversely affect beneficial uses."

---

[2] "Pursuant to the Porter-Cologne Act, the state is divided into nine regions. [Citation.] Each region has a regional water quality control board responsible for formulating and implementing a plan to promote the quality of the bodies of water within its jurisdiction. [Citation.] As part of the regional water quality control plans, the boards must designate the various 'beneficial uses' of each body of water, including 'domestic, municipal, agricultural, and industrial supply; power generation; recreation; aesthetic enjoyment; navigation; and preservation and enhancement of fish, wildlife, and other aquatic resources or preserves.' [Citations.]" (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 301 [58 Cal.Rptr.2d 855, 926 P.2d 1042].) "The plans are then submitted to the State Board for approval." (*State Water Resources Control Bd. v. Office of Admin. Law* (1993) 12 Cal.App.4th 697, 700 [16 Cal.Rptr.2d 25].)

Effluent discharges from the Deer Creek Wastewater Treatment Plant, while of "high quality," regularly exceeded the specified water objectives for pH, turbidity and temperature in late spring, summer and fall. The effluent is minimally diluted by the natural receiving water of the stream in the summer and fall, with the result that the "Basin Plan temperature objective [could not] be consistently achieved downstream of the point of effluent discharge" under the existing delta 5 degrees Fahrenheit requirement. Although the plant was significantly upgraded over the years in response to violations of the existing basin plan, during low-flow conditions Deer Creek still did not achieve compliance with the delta 5 degrees Fahrenheit requirement. In 2000, the District proposed a change in the designated beneficial uses of Deer Creek, particularly the cold freshwater habitat designation. The proposal was rejected by the Regional Board's staff in July of 2000, out of concern for potential presence of steelhead trout and the "rare occurrence of individual rainbow trout" in Deer Creek.

The District then pursued a "Site-Specific Basin Plan Amendment" for Deer Creek in lieu of further physical improvements to the plant, to achieve compliance with the Basin Plan objectives for pH, turbidity and temperature. In January of 2003, the Regional Board issued a staff report that also proposed a site-specific amendment to the Basin Plan for "Deer Creek temperature." The proposal noted that the delta 5 degrees Fahrenheit requirement is neither "supported by current science regarding the effects of temperature on aquatic life" nor "consistent with U.S. E.P.A.'s current approach to regulating temperature in ambient waters."

In accordance with the District's request, the Regional Board staff's report considered three alternatives, but recommended "site-specific, numeric temperature objectives for Deer Creek" to replace the generic delta 5 degrees Fahrenheit requirement.[3] The change suggested by the Regional Board staff was the "elimination of the maximum allowed change from 'natural temperatures' (i.e., 5° F) and use of seasonal, quantitative acute (daily maximum) and chronic (monthly average) temperature objectives developed specifically to maintain and protect the aquatic ecology and other beneficial uses of Deer Creek." The stated objective for the proposed amendment of the Basin Plan was to "produce a set of seasonal, site-specific, numeric objectives that will protect and maintain Deer Creek's existing and potential aquatic life uses." The recommended substitution of site-specific temperature objectives for the delta 5 degrees Fahrenheit requirement was predicated upon "available scientific literature" and the "EPA's current approach" to "regulation of

---

[3] The other two alternatives were no action, and adoption of the United States EPA (Environmental Protection Agency) national ambient criteria for temperature.

temperatures in ambient waters," which recognizes "it is primarily the *absolute* temperatures that occur in the creek," not the "increase in natural receiving water temperature," that affects the health of aquatic life.

A "two-step" approach was followed by the Regional Board staff to derive the appropriate seasonal temperature objectives for Deer Creek: first, compilation of scientific literature pertaining to all fish and aquatic insect species documented to occur in the creek; second, accumulation of existing site-specific biological data to characterize the diversity, structure and condition of the fish and aquatic insect populations in Deer Creek, both upstream and downstream of the wastewater treatment plant. The data was then integrated with available current scientific literature on the temperature requirements and thermal tolerance of aquatic life in Deer Creek.

The report concluded that compliance with specified seasonal temperature objectives would maintain temperatures in Deer Creek at levels "ecologically equivalent" to "those that have historically occurred." To replace the current standard of 5 degrees Fahrenheit maximum allowable temperature change in the natural receiving water, the amendment to the Basin Plan proposed: "For Deer Creek, source to [the] Cosumnes River, temperature changes due to discharges shall not cause creek temperatures to exceed the objectives stipulated" in an attached table. The enumerated site-specific temperature objectives in the table have both daily high and monthly average components: the daily maximum allowable temperatures and monthly average allowable temperatures in Deer Creek were set forth for each month of the year.[4] Even the "highest acute objective" proposed for Deer Creek of 81 degrees Fahrenheit during the summer months is consistent with and below the EPA temperature criteria for fish documented to exist in Deer Creek.

Based upon analysis of temperature monitoring data, the specified temperature objectives are less restrictive than the existing delta 5 degrees Fahrenheit requirement for the months of September through December. During the remaining eight months of the year, January through August or September, the specified temperature objectives are similarly restrictive or more restrictive than the delta 5 degrees Fahrenheit requirement, but still may not adequately protect populations of cold-water rainbow trout and anadromous fish such as steelhead trout and chinook salmon during the months of May through October.[5] The report suggested that the "less restrictive objectives

---

[4] January and February were grouped together and given the same daily maximum and monthly average temperature objectives, as were July through September.

[5] The specified daily maximum temperatures for May though October range from 77 degrees Fahrenheit to 81 degrees Fahrenheit, whereas the literature information on the thermal requirements of fish obtained by the Regional Board staff indicates that rainbow trout have an upper temperature limit of the "mid to upper 70's."

during the fall period are still protective of the aquatic organisms residing in the creek" at that time, and on "an overall annual basis" the site-specific objectives "would provide an equivalent to somewhat greater degree of thermal protection to Deer Creek's aquatic life."

The report further stated that the data obtained in numerous surveys of aquatic wildlife conducted between August of 1993 and October of 2000 revealed a lack of current self-sustaining populations of cold water fish or insects in Deer Creek. Only one survey in 1994 produced sightings of three adult rainbow trout of unknown origin, but not the presence of multiple age classes of fish indicative of a viable trout population. The eight fish surveys conducted both upstream and downstream of the wastewater treatment plant "found no evidence of a thriving natal, self-sustaining cold water fishery." A review of ambient temperature data by the California Department of Fish and Game (the Department) also indicated that daily maximum temperatures *upstream* of the wastewater treatment plant during the late spring, summer and fall routinely exceeded 70 degrees Fahrenheit and spiked as high as 83 degrees Fahrenheit, well above the thermal tolerances for rainbow trout. Thus, the Department asserted "[i]t is highly likely that Deer Creek did not have a self-sustaining rainbow trout population" even before urbanization—and installation of the wastewater treatment plant. The presence of anadromous salmonids was not documented in any form in the studies. Instead, according to the report, the self-sustaining populations of fish and aquatic insects "using Deer Creek are comprised of warmwater species."

The biological assessment data further shows Deer Creek's existing fish and aquatic insect communities are healthy, diverse and self-sustaining; the creek downstream of the wastewater treatment plant supports a more diverse native fish community than the upstream water; the effluent from the plant does not have a substantial adverse impact on the downstream condition of the creek or its existing aquatic communities. Differences between the aquatic communities above and below the wastewater treatment plant were recognized, but not considered indicative of degraded water quality or temperature regimes created by the plant. The conclusion was reached in the report that the proposed site-specific objectives are "protective of all current and probable future beneficial uses of Deer Creek."

The Regional Board staff and fishery biologists acknowledged the "potential" for infrequent "opportunistic use" of Deer Creek by "fall-run" chinook salmon and steelhead trout from the Cosumnes River in "some years" when hydrologic and temperature conditions are appropriate—that is, heavy rain in the fall and winter that promotes hydraulic continuity with the Cosumnes

River. According to the report, the effluent from the wastewater treatment plant has not reduced, and more likely has increased, the possibility of anadromous fish emigration into Deer Creek, due to the increased flow generated by the discharge. The more stringent proposed limitations on temperature levels in the winter, spring and summer were designed to provide greater protection for sensitive aquatic life stages and further the potential for fall-run chinook salmon and steelhead trout in the winter and spring. In the event opportunistic use of Deer Creek by fall-run chinook salmon and steelhead trout actually occurs in the future due to Cosumnes River anadromous fish restoration efforts, measures may then be implemented to assure that effluent from the wastewater treatment plant does not compromise this potential beneficial use.

Based upon input from the Department, The Nature Conservancy, and the National Marine Fisheries Service, among other sources, the report found that the proposed objectives would maintain water quality in Deer Creek, protect existing and probable aquatic life uses, and not cause degradation of water quality in any downstream water bodies. The Regional Board staff concluded that the proposed amendment to the Basin Plan "is protective of the creek's existing and probable future beneficial uses."

Conflicting evidence was presented, some of it in comments to the proposed amendments to the Basin Plan by DeltaKeeper. Anecdotal evidence of occasional historical sightings of rainbow trout in spring-fed deep pools by local fishermen and property owners was mentioned. DeltaKeeper also voiced criticism that the fish surveys failed to seek out areas of pools, springs and upwellings where rainbow trout may inhabit Deer Creek during the summer.

Following public comment on the report, revisions, and a hearing on January 31, 2003, the Regional Board found that proposed site-specific water quality objectives for temperature would be protective of Deer Creek's aquatic resources, and would not have a significant impact on the environment. The staff's recommendations as revised were adopted by the Regional Board. The State Board approved the amendment of the Deer Creek temperature objectives in the Basin Plan—and a modification of the amendment—as "in conformance with the requirements" of the federal Clean Water Act of 1977. (33 U.S.C. § 1251 et seq.) The United States EPA also approved the amendment, after which the Regional Board issued a notice of decision of the approval.

Appellants filed a petition for writ of mandate that sought to set aside the approval of the amendment to the Basin Plan and require respondents to adopt a site-specific temperature amendment for Deer Creek that protects all designated beneficial uses and complies with the requirements of the Clean Water Act, the Porter-Cologne Act, and CEQA. After a hearing the trial court decided that the site-specific temperature objectives implemented in the amendment of the Basin Plan protect the beneficial uses of Deer Creek and were approved in compliance with CEQA. This appeal followed the denial of the petition.

## DISCUSSION

I.  *Compliance with the Porter-Cologne Act and the Clean Water Act.*

Appellants claim that adoption and approval of the amendment to the temperature objectives of the Basin Plan by respondents violate the Porter-Cologne Act and the Clean Water Act by failing to "protect Deer Creek's native cold water fish." Two findings in the report are specifically challenged by appellants as lacking a "rational basis" in the record: first, that Deer Creek does not have a self-sustaining population of rainbow trout; and second, that "hydraulic conditions prevent salmonids from using Deer Creek in the fall." Appellants argue that both of these beneficial uses are not protected by the amended temperature objectives, which therefore "violate the Clean Water Act and Porter-Cologne."

A complex federal and state regulatory scheme promulgated under the federal Clean Water Act and the Porter-Cologne Act governs the quality of our waters. (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 619 [26 Cal.Rptr.3d 304, 108 P.3d 862]; *County of Los Angeles v. State Water Resources Control Bd.* (2006) 143 Cal.App.4th 985, 996 [50 Cal.Rptr.3d 619].) "The Clean Water Act is a 'comprehensive water quality statute designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." ' [Citation.] The act's national goal was to eliminate by the year 1985 'the discharge of pollutants into the navigable waters' of the United States. [Citation.]" (*City of Burbank, supra,* at p. 620.) With the Clean Water Act, "Congress delegated to those states with approved water quality programs the authority to issue permits to discharge pollutants under the National Pollutant Discharge Elimination System . . . ." (*WaterKeepers Northern California v. State Water Resources Control Bd.* (2002) 102 Cal.App.4th 1448, 1452 [126 Cal.Rptr.2d 389].) "Under the federal Clean Water Act, each state is free to enforce its own water quality

laws so long as its effluent limitations are not 'less stringent' than those set out in the Clean Water Act. (33 U.S.C. § 1370.) This led the California Legislature in 1972 to amend the state's Porter-Cologne Act 'to ensure consistency with the requirements for state programs implementing the Federal Water Pollution Control Act.' (§ 13372.)" (*City of Burbank, supra,* at p. 620.)

"The Porter-Cologne Act seeks 'to attain the highest water quality which is reasonable, considering all demands being made and to be made on [state] waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible.' (Wat. Code, § 13000.) The Water Boards are 'the principal state agencies with primary responsibility for the coordination and control of water quality.' (*Id.,* § 13001.)" (*Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 932–933 [38 Cal.Rptr.3d 220, 126 P.3d 1040].) "Each regional board is required to adopt a water quality control plan for all areas in the region; the plan must be consistent with the state policy for water quality control. (§ 13240.) A regional water quality control plan is also known as a basin plan. [Citation.] The State Board reviews and approves the basin plan. (§ 13245.)" (*County of Sacramento v. State Water Resources Control Bd.* (2007) 153 Cal.App.4th 1579, 1583 [64 Cal.Rptr.3d 302].)

Section 13241 requires a regional board to consider various factors in establishing water quality objectives, including, but not limited to: "(a) Past, present, and probable future beneficial uses of water. [¶] (b) Environmental characteristics of the hydrographic unit under consideration, including the quality of water available thereto. [¶] (c) Water quality conditions that could reasonably be achieved through the coordinated control of all factors which affect water quality in the area. [¶] (d) Economic considerations. [¶] (e) The need for developing housing within the region. [¶] (f) The need to develop and use recycled water." " 'In formulating a water quality control plan, the Board is invested with wide authority "to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." (§ 13000.) In fulfilling its statutory imperative, the Board is required to "establish such water quality objectives . . . as in its judgment will ensure the reasonable protection of beneficial uses . . ." (§ 13241), a conceptual classification far-reaching in scope. " 'Beneficial uses' of the waters of the state that may be protected against quality degradation include, but are not necessarily limited to, domestic, municipal, agricultural and industrial supply; power generation; recreation; aesthetic enjoyment; navigation; and preservation and enhancement of

fish, wildlife, and other aquatic resources or preserves." (§ 13050, subd. (f).) Thus, in carrying out its water quality planning function, the Board possesses broad powers and responsibilities in setting water quality [objectives].' [Citation.]" (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 697 [39 Cal.Rptr.3d 189], fns. omitted.) A " '[w]ater quality control plan' consists of a designation or establishment for the waters within a specified area of all of the following: [¶] (1) Beneficial uses to be protected. [¶] (2) Water quality objectives. [¶] (3) A program of implementation needed for achieving water quality objectives." (§ 13050, subd. (j).) " 'Water quality objectives' means the limits or levels of water quality constituents or characteristics which are established for the reasonable protection of beneficial uses of water or the prevention of nuisance within a specific area." (*Id.*, subd. (h).)

Our evaluation of the amendment to the temperature objectives of the Basin Plan requires us to "defer to the Boards' expertise as appropriate in the circumstances." (*County of Sacramento v. State Water Resources Control Bd.,* *supra,* 153 Cal.App.4th 1579, 1586.) In this proceeding by way of traditional mandamus (Code Civ. Proc., § 1085) to examine the quasi-legislative act of the Boards, our " ' " 'review is limited to an inquiry into whether the action was arbitrary, capricious or entirely lacking in evidentiary support, . . .' " . . . [and] [t]he petitioner has the burden of proof to show that the decision is unreasonable or invalid as a matter of law. [Citation.]' " (*City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1409 [38 Cal.Rptr.3d 373]; see also *Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 879 [22 Cal.Rptr.3d 128].) "In general, the court does not weigh the evidence adduced before the agency or substitute its judgment for that of the agency. [Citation.] The court will not concern itself with the wisdom underlying the agency's action." (*Mike Moore's 24-Hour Towing v. City of San Diego* (1996) 45 Cal.App.4th 1294, 1305 [53 Cal.Rptr.2d 355].)

A. *The Finding That Deer Creek Has No Self-sustaining Population of Rainbow Trout.*

The trial court sustained respondents' determination that Deer Creek has no self-sustaining population of rainbow trout. Appellants claim that the supporting evidence of the lack of rainbow trout populations in the creek is inadequate. They also maintain that the conflicting "undisputed and overwhelming" evidence indicates "rainbow trout have" historically "inhabited Deer Creek."

We first examine the evidence offered by the Regional Board to support the finding that suggests a viable population of rainbow trout does not inhabit Deer Creek. The data collected through a series of fish surveys conducted

from 1993 to 2000 by different parties constitutes credible evidence that a population of rainbow trout is not present in Deer Creek. A few isolated adult trout were observed in a single survey in 1994, but otherwise the data yielded from the comparatively thorough survey efforts in subsequent years failed to discern any rainbow trout. Stafford Lehr, an associate fisheries biologist with the Department, testified that his 1994 fish survey resulted in capture of just three adult trout dispersed "in the system," not multiple age classes of fish that would suggest a "viable self-sustaining rainbow trout population." Upon examination of what Lehr called the "most robust data set through time," Lehr asserted that if a "self-sustaining, viable rainbow trout population" was present in Deer Creek the "sampling data set would have picked that up," but it did not. He added that only three "individuals" of a "cold water order of bugs" were found in the surveys, and the system is "dominated by warm water species." The fish survey data is further corroborated by evidence from a Department survey of temperatures in Deer Creek, even those upstream of the wastewater treatment plant, which were found to exceed the thermal tolerances for rainbow trout for much of the year.

Appellants point to deficiencies in the survey data to claim that the record does not provide a "reasonable or rational basis" for the Regional Board's findings. They maintain that the surveys were confined to shallow, upstream water and failed to target deep pools where trout may exist in the summer. Appellants also suggest that the fish surveys were conducted long after the discharge of warm water effluent from the wastewater treatment plant began in 1974, and thus do not indicate the *historical* beneficial use of Deer Creek by rainbow trout before sewage discharges "altered radically the aquatic ecosystem." However, Lehr reviewed the survey data evidence and indicated that a population of rainbow trout would have been detected if it existed. The temperature survey data further demonstrated that summer water temperatures found throughout Deer Creek are incompatible with viable rainbow trout populations. Evidence was also presented that the difference in current water temperatures and the conditions extant prior to 1974 is negligible, and does not affect or limit aquatic life. According to Lehr, the species that exist today in Deer Creek, both upstream and downstream of the wastewater treatment plant, are essentially equivalent to those populations that existed prior to 1974.

Appellants have not established that the supporting evidence lacks credibility and thus renders the boards' decisions arbitrary. We are not entitled to discount evidence " 'unless it is physically impossible or inherently improbable and such inherent improbability plainly appears.' [Citation.]" (*Kunec v. Brea Redevelopment Agency* (1997) 55 Cal.App.4th 511, 518 [64 Cal.Rptr.2d 143].) We do not consider the evidence of data compiled from multiple fish

surveys and other studies so implausible or subject to dispute that we may discount it in this appeal.

Appellants also direct our attention to conflicting evidence in the record, which consists primarily of periodic observations over the years of rainbow trout in the deep pools of Deer Creek by adjoining landowners, fishermen, and a Regional Board engineer. While we do not disregard the evidence emphasized by appellants, it does nothing more than present a classic case of conflicting evidence which this court cannot resolve in their favor. We are required to resolve all conflicts in the evidence " 'in favor of the [prevailing party], and all legitimate and reasonable inferences indulged in to uphold the [finding] if possible. . . . When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.' [Citation.]" (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; see also *Tennison v. California Victim Comp. & Government Claims Bd.* (2007) 152 Cal.App.4th 1164, 1180–1181 [62 Cal.Rptr.3d 88]; *Mardesich v. California Youthful Offender Parole Bd.* (1999) 69 Cal.App.4th 1361, 1370 [82 Cal.Rptr.2d 294].) Moreover, an inference may be drawn from the evidence that the limited presence of trout in deep spring-fed pools is not likely to be adversely affected by the amended temperature objectives. Our review of the record convinces us that the finding that Deer Creek has no viable population of rainbow trout has sufficient evidentiary support.

B. *The Finding on Potential Use of Deer Creek by Anadromous Salmonids.*

We turn our review to the finding that the site-specific temperature objectives protect the use of Deer Creek by salmonids. The Regional Board recognized and assumed the "potential" for "opportunistic" use of Deer Creek in the winter by chinook salmon and steelhead trout when high-attraction flows at the confluence with the Cosumnes River may induce the migration of salmonids. The evidence indicates that salmonid use of Deer Creek is unlikely and may only occur infrequently when suitable hydrologic conditions exist.[6] Still, contrary to appellants' assertion, the Regional Board did not ignore the fact that under some conditions—particularly in the winter—hydraulic continuity may promote movement of migratory fish species from the Cosumnes River into Deer Creek for spawning. The flaw in appellants' reasoning is that the adoption of site-specific temperature objectives is demonstrated by the record to be protective of this possible beneficial use. During high-flow conditions in the winter when salmonids may potentially be present in Deer Creek, the specified temperature objectives are at least as

---

[6] A report by the National Marine Fisheries Service noted that adult salmonids have not been found in the survey work, and juveniles have not been observed by local residents or game wardens.

restrictive as the delta 5 degrees Fahrenheit requirement. The more stringent proposed limitations on temperature levels from January to September were designed to further the potential for fall-run chinook salmon and steelhead trout in the winter and spring. Evidence of monitoring was also presented that shows the discharge from the wastewater treatment plant during high-water conditions necessary for connectivity will not appreciably increase water temperature 35 miles away at the confluence of Deer Creek with the Cosumnes River, but may increase flow and thus promote rather than discourage anadromous fish migration into Deer Creek. The Porter-Cologne Act requires the Regional Board to set water quality objectives at limits or levels that provide for the "reasonable protection of beneficial uses of water or the prevention of nuisance in the specific area. (§ 13050, subd. (h).)" (*County of Sacramento v. State Water Resources Control Bd., supra,* 153 Cal.App.4th 1579, 1583.) We conclude the finding that the amended site-specific temperature objectives are protective of the beneficial potential use of Deer Creek by salmonids is supported by the evidence.

## II. *Compliance with the Functional Equivalent of CEQA.*

Appellants also argue that the Regional Board failed to comply with the requirements of CEQA for certified regulatory programs. Appellants' position is that the Regional Board adopted the "functional equivalent of a negative declaration," whereas a full environmental impact report (EIR) was required because "substantial evidence of a fair argument" exists that the amended site-specific temperature objectives may result in "significant environmental impacts." Appellants claim the failure of the Regional Board to prepare the functional equivalent of an environmental impact report "violated CEQA," and request that we require respondents to prepare and adopt "new objectives that will maintain and protect Deer Creek's beneficial uses while complying with CEQA."

██ "CEQA is implemented through initial studies, negative declarations and EIR's. [Citation.] 'CEQA requires a governmental agency [to] prepare an [EIR] whenever it considers approval of a proposed project that "may have a significant effect on the environment." ' [Citation.] 'If there is no substantial evidence a project "may have a significant effect on the environment" or the initial study identifies potential significant effects, but provides for mitigation revisions which make such effects insignificant, a public agency must adopt a negative declaration to such effect and, as a result, no EIR is required. [Citations.] However, the Supreme Court has recognized that CEQA requires the preparation of an EIR "whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." [Citations.] Thus, if substantial evidence in the record supports a "fair argument" significant impacts or effects may occur, an EIR is required

and a negative declaration cannot be certified.' [Citation.]" (*City of Arcadia v. State Water Resources Control Bd., supra*, 135 Cal.App.4th 1392, 1421, italics omitted.)

"A 'significant effect on the environment' is defined as 'a substantial, or potentially substantial, adverse change in the environment.' [Citations.] A 'significant effect on the environment' is 'limited to substantial, or potentially substantial, adverse changes in physical conditions which exist within the area as defined in [Public Resources Code] Section 21060.5.' [Citation.] [Public Resources Code] Section 21060.5 defines 'environment' as 'the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance.' [Citation.]" (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1180 [31 Cal.Rptr.3d 901].)

■ "The Legislature has made certain categories of projects exempt from CEQA." (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1191 [61 Cal.Rptr.2d 447].) "In lieu of the requirement for preparing an EIR or negative declaration, CEQA provides a mechanism for the exemption of certain regulatory programs which themselves require a plan or other written documentation containing environmental information. [Citations.] This exemption applies whenever a program has been certified by the Secretary of the Resources Agency. [Citation.] After certification, the internal plan or other documentation containing environmental information is used for review purposes in lieu of an EIR." (*City of Sacramento v. State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 973–974 [3 Cal.Rptr.2d 643].)

■ "The guidelines for implementation of CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.) do not directly apply to a certified regulatory program's environmental document. [Citation.] However, '[w]hen conducting its environmental review and preparing its documentation, a certified regulatory program is subject to the broad policy goals and substantive standards of CEQA.' [Citation.] [¶] In a certified program, an environmental document used as a substitute for an EIR must include '[a]lternatives to the activity and mitigation measures to avoid or reduce any significant or potentially significant effects that the project might have on the environment,' and a document used as a substitute negative declaration must include a 'statement that the agency's review of the project showed that the project would not have any significant or potentially significant effects on the environment and therefore no alternatives or mitigation measures are proposed to avoid or reduce any significant effects on the environment. This statement shall be supported by a checklist or other documentation to show the possible effects that the agency

examined in reaching this conclusion.' (Cal. Code Regs., tit. 14, § 15252, subd. (a)(2)(A), (B).)" (*City of Arcadia v. State Water Resources Control Bd., supra*, 135 Cal.App.4th 1392, 1422.)

As the parties acknowledge, "The basin planning process of the State Board and regional boards is a certified regulatory program (Cal. Code Regs., tit. 14, § 15251, subd. (g)), and the regulations implementing the program appear in the California Code of Regulations, title 23, sections 3775 to 3782. A regional board's submission of a plan for State Board approval must be accompanied by a brief description of the proposed activity, a completed environmental checklist prescribed by the State Board, and a written report addressing reasonable alternatives to the proposed activity and mitigation measures to minimize any significant adverse environmental impacts. (*Id.*, § 3777, subd. (a).)" (*City of Arcadia v. State Water Resources Control Bd., supra*, 135 Cal.App.4th 1392, 1422–1423.) The governing regulations further provide that the "board shall consult with other public agencies having jurisdiction by law with respect to the proposed activity and should consult with persons having special expertise with regard to the environmental effects involved in the proposed activity." (Cal. Code Regs., tit. 23, § 3778.) The board must also "prepare written responses to the comments containing significant environmental points raised during the evaluation process." (*Id.*, § 3779, subd. (a).)

Notwithstanding the exemption from CEQA, the preparation and approval process for basin plans is the "functional equivalent" of the preparation of an EIR contemplated by CEQA, and we undertake an equivalent review. (*City of Arcadia v. State Water Resources Control Bd., supra*, 135 Cal.App.4th 1392, 1408; *County of Santa Cruz v. State Bd. of Forestry* (1998) 64 Cal.App.4th 826, 830 [75 Cal.Rptr.2d 393].) "In a mandate proceeding to review an agency's decision for compliance with CEQA, we review the administrative record to determine whether the agency abused its discretion. [Citation.] 'Abuse of discretion is shown if (1) the agency has not proceeded in a manner required by law, or (2) the determination is not supported by substantial evidence.' [Citation.] 'When the informational requirements of CEQA are not complied with, an agency has failed to proceed in "a manner required by law" and has therefore abused its discretion.' [Citation.] Furthermore, 'when an agency fails to proceed as required by CEQA, harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation. Case law is clear that, in such cases, the error is prejudicial.' [Citation.]" (*State Water Resources Control Bd. Cases, supra*, 136 Cal.App.4th 674, 723; see also *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945–946 [91 Cal.Rptr.2d 66].) " 'Our task on appeal is "the same as the trial court's." [Citation.] Thus,

we conduct our review independent of the trial court's findings.' [Citation.]" (*City of Arcadia v. State Water Resources Control Bd., supra*, 135 Cal.App.4th 1392, 1409.)

We conclude from our review of the environmental impact report prepared by the Regional Board, as did the trial court, that it complies with the mandatory provisions for completion of an environmental checklist and report that describe the proposed activity, address reasonable alternatives, and set forth mitigation measures to minimize any significant adverse environmental impacts. We disagree with appellants' assessment that the environmental impact report constitutes nothing more than the functional equivalent of a negative declaration. The proposed project and its ramifications are thoroughly described both in the environmental impact report chapter, and elsewhere in the report. While a box was marked in the standard form environmental checklist that specified "the Proposed Project COULD NOT have a significant effect on the environment, and a NEGATIVE DECLARATION will be prepared," the environmental review proceeds to adequately examine and evaluate environmental impacts of the proposed project in all pertinent areas of consideration, the alternatives to the amendment, and mitigation measures, as would a full EIR prepared under CEQA. The requisite consultation with other public agencies and persons having special expertise with regard to the environmental effects involved in the proposed activity—the Department, The Nature Conservancy, the University of California, Davis, the National Marine Fisheries Service and the EPA—along with written responses to the comments—such as those from appellants are also found in the report.

This is not a case in which the Regional Board merely offered a checklist that denied the project would have any environmental impact and "obviously intended its documentation to be the functional equivalent of a negative declaration." (*City of Arcadia v. State Water Resources Control Bd., supra*, 135 Cal.App.4th 1392, 1423.) Rather, when read in its entirety the report demonstrates that the Regional Board considered all significant implications on the environment of the decision to adopt the proposed site-specific temperature amendments, in the nature of a full EIR, before finding that the project will not have a significant adverse effect on Deer Creek water quality objectives. We also find nothing in the report—including the marked checklist box that specified no significant effect on the environment—that would have misled the public or the State Board in the consideration of the project for approval. We therefore conclude that the Regional Board proceeded in the manner required by law by conducting an environmental review that complied with administrative regulations (Cal. Code Regs., tit. 23, §§ 3775–3782) which are a functional equivalent of CEQA.

## DISPOSITION

Accordingly, the order is affirmed.

Marchiano, P. J., and Margulies, J., concurred.