Filed 1/16/20; Ordered Published 2/10/20 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| STATE WATER RESOURCES CONTROL BOARD, Plaintiff and Respondent, v. BALDWIN & SONS, INC. et al., Defendants and Appellants. | D075617 (Super. Ct. No. 37-2018-00048033-CU-PT-CTL) |
| --- | --- |

APPEAL from an order of the Superior Court of San Diego County, David M. Rubin, Judge. Affirmed.

Gatzke Dillon & Ballance and Stephen F. Tee for Defendants and Appellants.

Xavier Becerra, Attorney General, Robert W. Byrne, Assistant Attorney General, Michael P. Cayaban and Kathryn M. Megli, Deputy Attorneys General for Plaintiff and Respondent.

Baldwin & Sons, Inc.; Baldwin & Sons, LLC; Sunranch Capital Partners, LLC; USA Portola Properties, LLC; Sunrise Pacific Construction; USA Portola East, LLC; USA Portola West, LLC; and SRC-PH Investments, LLC (collectively, Appellants)

appeal from an order compelling compliance with investigative (or administrative) subpoenas issued by the State Water Resources Control Board (State Board).

Appellants were involved (or believed to be involved) in the construction of a large-scale development in the Portola Hills Community in Lake Forest, California. The State Board initiated an investigation into alleged violations of the federal Clean Water Act (33 U.S.C. § 1251 et seq.) and California's Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.) occurring during construction activities. In connection with its investigation, the State Board issued subpoenas seeking Appellants' financial records. When Appellants refused to produce the requested financial records, the State Board sought a court order compelling compliance with the subpoenas. With the exception of tax returns (which are not at issue in this appeal), the trial court concluded that the information sought was relevant to the State Board's investigation and subject to disclosure pursuant to the investigative subpoenas. The court issued an order compelling Appellants to comply with the subpoenas. The court also issued a protective order to provide additional protection from public disclosure beyond what is provided by Government Code section 11183, which makes it a misdemeanor for any public officer to "divulge any information or evidence acquired" through the issuance of investigative subpoenas. (Gov. Code, § 11183.)

Appellants raise three contentions on appeal: (1) their financial records are not reasonably relevant to the State Board's investigation; (2) compelling production of their financial records violates their right to privacy; and (3) the protective order does not adequately protect against disclosure of their private financial information to third parties.

2

We reject these claims and affirm the challenged order compelling production of the Appellants' financial records subject to a protective order.

FACTUAL AND PROCEDURAL BACKGROUND

California's Porter-Cologne Water Quality Control Act establishes a statewide program for water quality control. Nine regional boards, overseen by the State Board, administer the program in their respective regions. (Wat. Code, §§ 13140, 13200, 13201, 13240.) The Portola project, involving development of the Portola Hills community in Lake Forest, California, is within the jurisdiction of the California Regional Water Quality Control Board, San Diego Region (Regional Board).

In 2016, the Regional Board issued notices of violation to Sunranch Capital Partners LLC, USA Portola Properties, LLC, and "Baldwin & Sons." Sunranch Capital Partners LLC and USA Portola Properties, LLC signed the Construction General Permit covering the project,[1] and are therefore considered permittees with certain permit

---

[1]     This fact appears undisputed, but the notices of intent used to obtain coverage under the Construction General Permit are not in the record for this court to review. On our own motion, we take judicial notice of the Construction General Permit and corresponding fact sheet, available through the State Board's website at <https://www.waterboards.ca.gov/water_issues/programs/stormwater/docs/constpermits/ wqo_2009_0009_complete.pdf> [as of Jan. 16, 2020], archived at <https://perma.cc/B9PM-2YZG>). (Evid. Code, §§ 452, subd. (c), 459; see *People ex rel. Cal. Regional Wat. Quality Control Bd. v. Barry* (1987) 194 Cal.App.3d 158, 174, fn. 12.)
        The Construction General Permit refers to the "National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges Associated with Construction and Land Disturbance Activities, Order No. 2009-0009-DWQ, NPDES No. CAS000002," which is discussed in more detail *post*.

compliance obligations, but Appellants state that Baldwin & Sons, LLC was not an owner, contractor, or permittee in relation to the project.[2]

The notices of violation identify alleged Construction General Permit violations, which in turn constitute violations of federal and state water quality laws. The alleged violations include failure to mitigate and prevent harmful environmental discharges and failure to implement best management practices to minimize and prevent discharges of sediment, stormwater runoff, and erosion. These failures were alleged to have adversely impacted neighboring Aliso Creek, Serrano Canyon Creek, and tributaries to the creeks.

The State Board initiated an investigation into the Portola construction project to determine if an administrative civil liability (ACL) complaint against responsible entities was warranted. (Wat. Code, § 13385, subd. (c).) In June 2016, the State Board served its initial subpoenas in the investigation, which resulted in the production of thousands of pages of documents related to the project and other construction activities. The initial subpoenas were directed to Sunranch Capital Partners, LLC and USA Portola Properties,

---

[2]    According to Appellants, Sunranch Capital Partners, LLC acquired a portion of the development, Portola Center South, in 2010 and conveyed ownership to its subsidiary SRC-PH Investments, LLC, in 2015. Later in 2015, SRC-PH Investments, LLC conveyed "most" of Portola Center South to a third-party purchaser. Sunrise Pacific Construction was the general contractor for Portola Center South. In 2003, USA Portola Properties, LLC acquired Portola Center Northwest and Portola Center Northeast. USA Portola Properties, LLC conveyed ownership of Portola Center Northwest to its wholly owned subsidiary, USA Portola West, LLC in 2015, and conveyed ownership of Portola Center Northeast to USA Portola East, LLC in 2017. Baldwin & Sons, Inc. was the general contractor for both the Portola Center Northwest and Northeast projects.

LLC, the two entities who signed the notices of intent to be covered by the Construction General Permit.

According to the State Board, the responding parties "failed to provide a clear understanding of the relationship between and among other entities who appeared to be involved in the [p]roject." The Regional Board obtained documents from another source, however, "that indicated a relationship existed" between the responding entities and "other entities who appeared to be paying for [p]roject-related expenses" including Baldwin & Sons, Inc., Sunrise Pacific Construction, and SRC-PH Investments, LLC. When the State Board obtained information which it contends "reveal[ed] other entities and individuals were involved in [p]ermit compliance at the [p]roject, including having control and authority over environmental decisions," the State Board issued additional subpoenas to the other entities involved in this appeal, which the State Board believes are associated with or connected to the project.

The challenged subpoenas seek financial documents detailing the entities' interrelationship, financial documents related to the entities' corporate management, documents related to the development project including lease agreements and project operations, and documents related to the financial ability of responsible entities to pay any administrative civil liability imposed during enforcement proceedings. Subpoenaed documents include income tax filings, loan agreements, bank and financial statements,

5

and economic reports and sales projections related to the development project.  The requests are limited as to time (January 1, 2012 or later).[3]

Appellants refused to comply with the subpoenas, claiming the requested financial documents (1) were protected from disclosure by common law and constitutional rights to privacy, and (2) were not reasonably relevant to the investigation, thus constituting an unreasonable search and seizure.  After seven months of discussions regarding the scope of disclosure and a potential confidentiality agreement, the parties were not able to reach an agreement and Appellants continued to refuse to produce the requested financial documents.

The State Board filed a petition for an order compelling compliance with the subpoenas pursuant to Government Code section 11187,[4] which Appellants opposed.  The State Board argued that the investigation was within the scope of its authority and the subpoenas were properly issued and served.  The State Board further argued that the subpoenas sought information reasonably relevant to its investigation, including information necessary to assist the State Board in preparing an ACL complaint.

---

[3]     The specific categories contained in the subpoenas are identified in more detail *post*.

[4]     Government Code section 11187, subdivision (a), provides in part that "if any witness refuses to . . . produce or permit the inspection or copying of any papers . . . required by subpoena, the head of the department may petition the superior court in the county in which the hearing or investigation is pending or the county in which . . . items are designated in the subpoena to be produced, for an order compelling the person to . . . produce and permit the inspection and copying of the papers or other items required by the subpoena . . . ."

With one exception, the trial court granted the State Board's request to compel production of the subpoenaed records (hereinafter, "Financial Documents").[5] The trial court reasoned that the State Board was authorized to conduct the investigation, the demands made in the subpoenas were not too indefinite, and the Financial Documents were reasonably relevant to the State Board's investigation. The trial court also directed entry of a protective order, pursuant to which the State Board agreed not to include any protected material in the administrative record (unless Appellants submit these materials on their own), and further agreed protected material would not be subject to public records act or litigation requests for disclosure. With the protective order in place, the trial court directed Appellants to produce responsive Financial Documents.[6] This appeal followed.[7]

---

[5] The trial court denied the State Board's request to compel production of Appellants' tax returns. The parties do not challenge that ruling on appeal. "Financial Documents" refers to the documents identified in the subpoena, excluding the tax returns.

[6] Neither party challenges the protective order's provision that protected records are not subject to litigation or public records act requests.

[7] The trial court's order compelling compliance with an investigative subpoena is appealable. (*Dana Point Safe Harbor Collective v. Superior Court* (2010) 51 Cal.4th 1, 11 [order compelling compliance with legislative subpoena was appealable final order]; *People ex rel. DuFauchard v. U.S. Financial Management, Inc.* (2009) 169 Cal.App.4th 1502, 1511 [order compelling compliance with administrative subpoena was appealable as a final judgment under Code of Civil Procedure section 904.1].) The trial court granted Appellants' request to stay the order compelling compliance with the subpoenas pending resolution of this appeal. We grant the State Board's motion to augment the record to include this order, and, in light of our affirmance of the trial court's order, direct that the stay shall be lifted as of the date this decision is final. (Cal. Rules of Court, rule 8.264(b)(1).)

DISCUSSION

I.

*Statutory and Regulatory Background*

"A complex federal and state regulatory scheme promulgated under the federal Clean Water Act and the Porter-Cologne [Water Quality Control] Act governs the quality of our waters." (*California Sportfishing Protection Alliance v. State Water Resources Control Bd.* (2008) 160 Cal.App.4th 1625, 1637.) The Clean Water Act was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." (33 U.S.C. § 1251(a).) Similarly, the Porter-Cologne Water Quality Control Act is designed "to attain the highest water quality which is reasonable, considering all demands being made and to be made on [state] water and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." (Wat. Code, § 13000.)

The Clean Water Act prohibits the discharge of pollutants into navigable waters of the United States without proper authorization (33 U.S.C. § 1311(a)), such as through a permit issued under the National Pollutant Discharge Elimination System (NPDES).

(33 U.S.C. § 1342; 40 C.F.R.§§ 122.1-122.64.)  A NPDES permit is required for stormwater discharges associated with qualifying construction activities.[8]

The United States Environmental Protection Agency (EPA) has delegated to the State Board the authority to issue NPDES permits.  (33 U.S.C. § 1342(b); 54 Fed. Reg. 40664, 40665 (Oct. 3, 1989); Wat. Code, § 13160 [designating State Board as implementing authority under the Clean Water Act]; see *City of Brentwood v. Central Valley Regional Water Quality Control Bd.* (2004) 123 Cal.App.4th 714, 723 ["Permits issued under chapter 5.5 [of the California Water Code], and enforced in part under section 13385, are an integral part of the Clean Water Act's discharge permit system."].)  The State Board elected to issue a statewide general permit for stormwater discharges associated with construction activity—authorizing sites to operate under the statewide permit rather than obtaining individual, site-specific pollutant discharge permits.

---

[8]    The Clean Water Act requires a NPDES permit for industrial discharges (33 U.S.C. §§ 1311(a), 1342(p)(3)), which include stormwater associated with construction activities that include clearing or grading of at least one acre of land. (40 C.F.R. § 122.26(b)(14)(x) and (b)(15); 55 Fed.Reg. 47900, 48033-48034 (Nov. 16, 1990) ["Phase I" regulations governing stormwater discharges from construction activities of five acres or larger]; 64 Fed.Reg. 68722 (Dec. 8, 1999) ["Phase II" regulations, extending requirements to construction activities that disturb equal to or greater than one acre of land]; see *Department of Finance v. Commission on State Mandates* (2016) 1 Cal.5th 749, 770 (*Department of Finance*).)

(*Department of Finance*, *supra*, 1 Cal.5th at p. 770.)[9]  To apply for permit coverage, the

legally responsible person for the construction activity must submit permit registration

documents including a notice of intent to be covered by the statewide general permit.

(Construction General Permit, at p. 15.)  The Construction General Permit requires that

best management practices (BMPs) be properly implemented for construction activities to

prevent, minimize, and control potential sources of stormwater pollution, and to protect

water quality.[10]

Discharging pollutants without a NPDES permit, or in violation of the terms of a

NPDES permit, subjects the violator to state and federal enforcement actions.

(Wat. Code, §§ 13385, subd. (c), 13323, subd. (a); 33 U.S.C. §§ 1311(a), 1319,

1342(b)(7); see Construction General Permit, at p. 22 ["Any permit noncompliance

constitutes a violation of the Clean Water Act (CWA) and the Porter-Cologne Water

Quality Control Act and is grounds for enforcement action and/or removal from General

---

[9]  "There are two types of NPDES permit:  individual and general.  [Citation].  'An individual permit authorizes a specific entity to discharge a pollutant in a specific place and is issued after an informal agency adjudication process.'  [Citations]  A general permit, by contrast, is issued for an entire class of hypothetical dischargers in a given geographical region and is issued pursuant to administrative rulemaking procedures."  (*Alaska Community Action on Toxics v. Aurora Energy Services, LLC* (9th Cir. 2014) 765 F.3d 1169, 1171.)

[10]  "BMPs are scheduling of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the discharge of pollutants to waters of the United States.  BMPs also include treatment requirements, operating procedures, and practice[s] to control site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw materials."  (Construction General Permit, at p. 7, fn. 3.)

Permit coverage."]; 40 C.F.R. § 122.41 ["[t]he permittee must comply with all conditions of" the governing NPDES permit and "[a]ny permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action"].)  Civil liability may be imposed administratively by the State Board or Regional Board through the issuance of an ACL complaint.  (Wat. Code, §§ 13385, subd. (c), 13323, subd. (a).)  "The complaint shall allege the act or failure to act that constitutes a violation of law, the provision of law authorizing civil liability to be imposed . . . , and the proposed civil liability."  (Wat. Code, § 13323, subd. (a).)  The alleged violator is entitled to a hearing before the State Board or Regional Board within 90 days of being served with the complaint.  (*Id*., subds. (b), (c).)

In determining the amount of the proposed civil liability, the State Board "shall take into account the nature, circumstances, extent, and gravity of the violation or violations, whether the discharge is susceptible to cleanup or abatement, the degree of toxicity of the discharge, and, with respect to the violator, the ability to pay, the effect on its ability to continue its business, any voluntary cleanup efforts undertaken, any prior history of violations, the degree of culpability, economic benefit or savings, if any, resulting from the violation, and other matters that justice may require."  (Wat. Code, § 13385, subd. (e); see *id.*, § 13327 [nearly verbatim factors].)  The State Board is statutorily required to assess administrative civil liability, "[a]t a minimum, . . . at a level that recovers the economic benefits, if any, derived from the acts that constitute the violation."  (*Id*., § 13385, subd. (e).)

The State Board adopted a Water Quality Enforcement Policy (enforcement policy) to define its enforcement process. (See Cal. Code Regs., tit. 23, § 2910 [2017 enforcement policy].)[11] The stated goal of the enforcement policy is "to protect and enhance the quality of the waters of the State by defining an enforcement process that addresses water quality problems in the most efficient, effective, and consistent manner." As relevant here, the enforcement policy states that the civil liability amount should "[f]ully eliminate any economic advantage obtained from noncompliance"; "[f]ully eliminate any unfair competitive advantage obtained from noncompliance"; "[d]eter the specific person(s) identified in the ACL from committing further violations"; and "[d]eter similarly situated person(s) in the regulated community from committing the same or similar violations."

The enforcement policy describes a 10-step methodology used by the State Board to determine the appropriate civil liability amount. First, the base liability amount is determined, based on the potential for harm of the discharge, the volume and/or duration of the discharge (the "Per Gallon and Per Day Assessments"), and the violator's conduct. This base liability amount may then be adjusted based on the violator's ability to pay, ability to continue in business, "additional factors that should be considered that would

---

11    The parties appear to agree that the 2010 enforcement policy applies here. For purposes of this appeal, we need not address which version applies. We refer to the 2010 enforcement policy herein. The policy was approved by the Office of Administrative Law, became effective on May 20, 2010, and is available at <https://www.waterboards.ca.gov/water_issues/programs/enforcement/docs/enf_policy_final111709.pdf.> [as of Jan. 16, 2020], archived at <https://perma.cc/6T2P-2ALM>.

justify an increase or a reduction," and the economic benefit derived from the violations. An "economic benefit" is defined as "any savings or monetary gain derived from the act or omission that constitutes the violation." It includes delayed costs and avoided costs, as well as "any other economic benefits" gained by the discharger.[12] Every administrative liability imposed must account for the economic benefit derived from the violation. (See Wat. Code, § 13385, subd. (e) ["At a minimum, liability shall be assessed at a level that recovers the economic benefits . . . derived from the acts that constitute the violation."].) The enforcement policy emphasizes, "The adjusted Total Base Liability Amount shall be at least 10 percent higher than the Economic Benefit Amount so that liabilities are not construed as the cost of doing business and that the assessed liability provides a meaningful deterrent to future violations."

## II.

### *Investigative Subpoenas*

A. *Additional Background*

As previously noted, the State Board issued subpoenas seeking information it asserts will assist in an investigation of Appellants' alleged violations with respect to the Portola project. Appellants identify the following requests for financial-related

---

[12] The 2010 enforcement policy states: "Delayed costs include expenditures that should have been made sooner (e.g., for capital improvements such as plant upgrades and collection system improvements, training, development of procedures and practices) but that the discharger is still obligated to perform. Avoided costs include expenditures for equipment or services that the discharger should have incurred to avoid the incident of noncompliance, but that are no longer required." (See fn. 11, *ante*.)

13

information as the subject of this appeal: (1) "loan agreements, bank account statements, checks, and payments, relating to the transfer, repayment, or advancement of money" among Appellants' corporate officers (2012-2017) (Request Nos. 1 and 2); (2) "financial statements, independently audited or otherwise" (2012-2016) (Request No. 8); (3) "economic reports, bond estimates, and sales projections, which relate to the anticipated revenue from the project" (Request No. 9); (4) "credit sources as of 2017" (Request No. 10); (5) "current sources of capital," including "the status and terms of loans" (Request No. 11); (6) "construction lending for the project" (Request No. 12); and (7) "feasibility analyses for the project" (Request No. 14). (Some capitalization omitted.)

In addition, the State Board requested documents related to Appellants' corporate management (e.g., articles of incorporation, corporate minutes, bylaws, and stock statements).

14

B. *Analysis*

The State Board may issue subpoenas as part of an investigation within the agency's jurisdiction. (Gov. Code, §§ 11180, 11181.)[13] Such subpoenas are valid as long as they meet the three-part test articulated by our Supreme Court in *Brovelli v. Superior Court of Los Angeles County* (1961) 56 Cal.2d 524 (*Brovelli*). Specifically, the subpoenas are valid if: (1) they inquire into matters the agency is authorized to investigate; (2) they are "not too indefinite"; and (3) the information sought is "reasonably relevant" to the investigation. (*Id*. at p. 529; see *Craib v. Bulmash* (1989) 49 Cal.3d 475, 482 (*Craib*) [administrative subpoena may be enforced if it is issued "for

---

13    Government Code section 11180 authorizes department heads to investigate matters within the department's jurisdiction. (Gov. Code, § 11180 ["The head of each department may make investigations and prosecute actions concerning: [¶] (a) All matters relating to the business activities and subjects under the jurisdiction of the department. [¶] (b) Violations of any law or rule or order of the department. [¶] (c) Such other matters as may be provided by law."].) Government Code section 11181 authorizes the department head to issue subpoenas for the production of documents. (Gov. Code, § 11181, subd. (e) ["In connection with any investigation or action authorized by this article, the department head may . . . : [¶] . . . [¶] Issue subpoenas for the attendance of witnesses and the production of papers, books, accounts, documents, any writing as defined by Section 250 of the Evidence Code, tangible things, and testimony pertinent or material to any inquiry, investigation, hearing, proceeding, or action conducted in any part of the state."].) If the responding party fails to comply with the subpoena, the department head may file a petition in the superior court for an order compelling compliance. (Gov. Code, §§ 11186, 11187.)

'a *lawfully authorized purpose*, within the power of [the legislative body] to command,' "

and seeks documents that "are '*relevant*' to the inquiry."].)[14]

We review the legal question of whether the subpoenas meet the constitutional standards for enforcement de novo. (*Grafilo v. Cohanshohet* (2019) 32 Cal.App.5th 428, 436 (*Grafilo*) ["The question of whether a subpoena meets the constitutional standards for enforcement is a question of law to be reviewed de novo."]; *State ex rel. Dept. of Pesticide Regulation v. Pet Food Express* (2008) 165 Cal.App.4th 841, 854 ["We review de novo the question whether the subpoena meets the standards for enforcement."], citing *Millan v. Restaurant Enterprises Group, Inc*. (1993) 14 Cal.App.4th 477, 485 (*Millan*) (which cited two cases that addressed legal questions under the de novo standard of review).)[15]

---

[14] "Trial courts are authorized to enforce investigative subpoenas that are 'regularly issued.' (Gov. Code, § 11188.) 'The term "regularly issued" means in accordance with the provisions of sections 11180, 11181, 11182, 11184 and 11185 of the Government Code providing for the matters which may be investigated, the acts authorized in connection with investigations, and the service of process.' " (*Stiger v. Flippin* (2011) 201 Cal.App.4th 646, 657.) Appellants do not contend that the State Board's subpoenas were not "regularly issued" within the meaning of these Government Code provisions. We therefore focus on the three-part *Brovelli* test.

[15] Although a different standard of review may apply to aspects of Appellants' privacy right claims (see *Grafilo*, *supra*, 32 Cal.App.5th at p. 436 [factual findings on the issue of whether good cause exists to intrude on privacy rights is reviewed under the substantial evidence standard of review]), we would reach the same outcome under either standard.

## 1. *Authorized Purpose*

The State Board is authorized to issue a subpoena "in any inquiry [or] investigation" (Gov. Code, § 11181, subd. (e)), and it has the power to investigate alleged stormwater discharge violations.  As outlined *ante*, stormwater discharges from construction activities require a NPDES permit,[16] and violations of the Construction General Permit—which constitutes the applicable NPDES permit here—subject the violator to enforcement actions including the assessment of civil penalties.  (See, e.g., Wat. Code, § 13385 [authorizing imposition of civil liability for violations of the California Water Code and federal Clean Water Act]; Wat. Code, § 13323 [specifying procedures for imposing administrative civil liability]; 33 U.S.C. § 1319 [EPA's concurrent authority to enforce NPDES permits issued by states]; Construction General Permit, at p. 22 [permit noncompliance violates state and federal water quality laws and is grounds for an enforcement action]; 40 C.F.R. § 122.41 [any NPDES "permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action"].)  The notices of violation arising from the Portola development establish that the State Board is investigating—and needs to enforce—precisely these

---

16      See footnote 8, *ante*.

17

types of alleged violations in this case.[17] (*Craib*, *supra*, 49 Cal.3d at p. 483; see *Millan*, *supra*, 14 Cal.App.4th at p. 487 ["An administrative agency has the authority to conduct an investigation and to subpoena records to determine whether the entity under investigation is subject to the agency's jurisdiction and whether there have been violations of provisions over which the agency has jurisdiction."].) The subpoenas therefore do not exceed the scope of the State Board's authority. (*Brovelli*, *supra*, 56 Cal.2d at p. 529.)

2. *Specificity*

The targeted Financial Documents were identified with sufficient particularity to allow a response. The State Board has clearly and specifically identified the categories of documents subject to production, and has limited its requests in both scope and time. The Appellants have not noted any deficiency in this regard, and we perceive none based on our review of the agency's specific requests. The subpoenas therefore meet the *Brovelli* court's specificity requirement. (*Brovelli*, *supra*, 56 Cal.2d at p. 529 [requests cannot be "too indefinite"].)

---

[17] Among other things, the notices of violation allege violations of state and federal law resulting from the following: failure to comply with discharge prohibitions for construction activity; failure to comply with conditions of the Construction General Permit; failure to mitigate discharges to the environment; failure to properly operate and maintain BMPs to achieve permit compliance; failure to implement adequate erosion and runoff controls; and failure to include information in the stormwater pollution prevention plan to demonstrate compliance with the permit.

3. *Relevance*

Appellants contend their compliance with the subpoenas is not required because the information sought is not reasonably relevant to the State Board's investigation. We disagree.

For purposes of administrative subpoenas, the relevance standard is construed broadly. (*Brovelli*, *supra*, 56 Cal.2d at p. 529 [information sought in an administrative subpoena need only be "reasonably relevant"]; see *McLane Co., Inc. v. EEOC* (2017) __ U.S. __ [137 S.Ct. 1159, 197 L.Ed.2d 500] [referring to "the established rule that the term 'relevant' be understood 'generously' to permit the [administrative agency] 'access to virtually any material that might cast light on the allegations against the [alleged violator]' "]; *Endicott Johnson Corp. v. Perkins* (1943) 317 U.S. 501, 509 [relevance is established when the information sought is not "plainly incompetent or irrelevant to any lawful purpose"]; *EEOC v. Shell Oil Co.* (1984) 466 U.S. 54, 68 [relevance requirement as a "limitation on the [agency's] investigative authority is not especially constraining"].) An administrative agency is not required to meet the same standard as a party seeking discovery in pending litigation. As our Supreme Court explained in *Brovelli*, an agency's administrative investigations are similar to a grand jury proceeding, "which does not depend on a case or controversy in order to get evidence but can investigate 'merely on suspicion that the law is violated, or even just because it wants assurance that it is not.' " (*Brovelli*, at p. 529, quoting *United States v. Morton Salt Co.* (1950) 338 U.S. 632, 642-

643.)[18]  The court in *Brovelli* relied on *Morton Salt*, where the United States Supreme Court explained that "[t]he only power that is involved [in an administrative inquiry] is the power to get information from those who best can give it and who are most interested in not doing so.  Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry."  (*Morton Salt*, at p. 642.)

Given the expansive definition of relevance that governs subpoena enforcement actions, we conclude the trial court properly enforced the State Board's subpoenas for Financial Documents.  The trial court considered two arguments proffered by the State Board to support its position that the Financial Documents are reasonably relevant to its investigation of the Portola project.  First, the State Board contends the Financial Documents are needed to help identify responsible entities who allegedly violated environmental laws governing construction activities associated with the development project.  Second, the State Board contends the Financial Documents are reasonably relevant to its determination of the appropriate administrative liability amount to recommend in the event it concludes an ACL complaint is warranted against one or more

---

[18]  A grand jury subpoena permits the government to obtain documents unless "there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation." (*United States v. R. Enterprises, Inc*. (1991) 498 U.S. 292, 301.)

responsible entities.  We conclude both rationales support the requested enforcement of the State Board's subpoenas for Financial Documents based on the facts of this case.

Although Appellants appear to confine their challenge to subpoena categories which specifically refer to financial records, the State Board also sought documents related to Appellants' corporate management, including articles of incorporation, corporate minutes, bylaws, and stock statements, and information regarding certain agreements between and among "related entities."[19]  The State Board contends that these documents are relevant to help identify entities responsible for discharge violations, and further contends that evidence uncovered in its investigation thus far suggests that the two parties identified on the construction permits may not be the only responsible parties. Just as an analogous grand jury proceeding may obtain information from both subjects and targets of an investigation to determine whether specific charges are warranted, and against whom to bring those charges, the State Board may reasonably obtain information from Appellants to help determine which entities (if any) are legally responsible for any Construction General Permit or other environmental violations at the Portola project. (See *Brovelli*, *supra*, 56 Cal.2d at p. 529 [analogizing administrative subpoenas to grand

---

[19]    In the subpoena issued to Baldwin & Sons, Inc., the term "related entity" was defined to include "Baldwin & Sons, LLC; USA Portola East, LLC; USA Portola West, LLC; Sunrise Pacific Construction, Inc[.]; Sunranch Capital Partners, LLC; USA Portola Properties, LLC; SRC-PH Investments, LLC; LS-OC Portola Lender, LLC; Sunrise Corporation; Sunrise Company; USA Portola Partners LLC; LS OC Portola LLC; and LS OC Portola EB-5 LLC; along with officers, employees, agents, and representatives of the foregoing," as well as "any subsidiary or management entity of Baldwin & Sons, Inc." (Some capitalization omitted.)

jury proceedings].)  At this investigative stage, the precise character and scope of possible violations (and possible violators) may not be known.  The State Board's requests regarding the interrelatedness of various entities, and the nature and extent of their involvement (including their control over financial and other decisions that may have impacted permit compliance), are reasonably relevant to assist in making these types of determinations.[20]  (See, e.g., *Oklahoma Press Pub. Co. v. Walling* (1946) 327 U.S. 186, 201 [noting that administrative subpoenas are authorized "to discover and procure evidence, not to prove a pending charge or complaint, but upon which to make one"]; *Department of Fair Employment & Housing v. Superior Court* (2002) 99 Cal.App.4th 896, 902 (*Fair Employment & Housing*) [compelling compliance with subpoena for rental records of property manager's current, past, and prospective tenants, at specific property under investigation as well as other properties she managed; information was needed "to decide whether to charge a statutory violation, or to make the decision that no further action is necessary"]; *United States v. Golden Valley Elec. Ass'n* (9th Cir. 2012) 689 F.3d 1108, 1113-1114 [affirming order compelling compliance with administrative subpoena issued by the Drug Enforcement Administration which might

---

[20]    As the State Board notes, the finances of a violator's parent company are sometimes relevant in environmental enforcement proceedings.  (See, e.g., *U.S. v. Municipal Authority of Union Tp.* (3d Cir. 1998) 150 F.3d 259, 268-269 (*Municipal Authority*) [holding in Clean Water Act case that the financial condition of a defendant's parent corporation is relevant in assessing the economic impact on the defendant, where the parent corporation retains the defendant company's earnings].)  The State Board therefore needs information regarding these finances as well as the interrelationship of the subject entities.

"identify possible suspects," and reasoning that " '[r]elevancy is determined in terms of the investigation rather than in terms of evidentiary relevance' "].) Because these are legitimate areas of inquiry under the governing state and federal statutes at issue, the documents requested are relevant to the State Board's investigation.

In addition to identifying responsible entities and setting forth alleged findings of fact and violations of law as to those entities, the State Board must identify a proposed penalty amount in any ACL complaint it pursues. (Wat. Code, § 13323, subd. (a).) The Financial Documents are reasonably relevant to this aspect of the State Board's statutory duties as well. The Water Code specifies several factors that the State Board must consider in determining the appropriate civil penalty to recommend for discharge violations. The State Board is required to consider various factors regarding the severity of the violations, and certain factors regarding the violator.[21] Among other considerations with respect to the violator, the State Board must consider the violator's "ability to pay," "the effect on its ability to continue its business," any "economic benefit or savings . . . resulting from the violation," and "other matters that justice may require."

---

[21] Water Code section 13385, subdivision (c) specifies a maximum civil liability amount, and the State Board's enforcement policy further specifies the steps the State Board uses to calculate this amount. (Wat. Code, § 13385, subd. (c) ["Civil liability may be imposed administratively by the state board or a regional board . . . in an amount not to exceed the sum of both of the following: [¶] (1) Ten thousand dollars ($10,000) for each day in which the violation occurs. [¶] (2) Where there is a discharge, any portion of which is not susceptible to cleanup or is not cleaned up, and the volume discharged but not cleaned up exceeds 1,000 gallons, an additional liability not to exceed ten dollars ($10) multiplied by the number of gallons by which the volume discharged but not cleaned up exceeds 1,000 gallons."].) The State Board acknowledges that the subpoenaed documents are not necessary to make this maximum liability assessment.

23

(Wat. Code, § 13385, subd. (e).)[22] In addition, the State Board is statutorily required to assess administrative civil liability, "[a]t a minimum, . . . at a level that recovers the economic benefits, if any, derived from the acts that constitute the violation." (*Ibid*.)[23] The requested financial information is reasonably relevant to consideration of these statutory factors here.

The trial court correctly recognized that the subpoenaed Financial Documents are relevant to assessing the economic benefit derived from the alleged violations. Challenging the relevance of the requested financial information, Appellants point to the "objective" definition of "avoided costs" associated with the State Board's consideration of economic benefits of the violation, and argue that their finances have no bearing on this issue. They contend, for example, that the State Board can determine how much it would have cost to implement certain control measures (if the alleged violation involves the failure to implement best management practices), and that the State Board does not need to know anything about Appellants' "actual costs or finances" to make such determinations. We reject Appellants' narrow interpretation of relevance for purposes of this investigative subpoena enforcement proceeding. The statute does not define the terms "economic benefit or savings," or "economic benefits." (See Wat. Code, § 13385,

_____

[22]    The State Board's enforcement policy identifies these same factors as part of its methodology for calculating administrative civil liability amounts.

[23]    In their reply brief on appeal, Appellants erroneously claim the State Board did not argue in the trial court that the requested documents are relevant to an economic benefit assessment. The State Board cited this principle in its petition, referenced it in briefs in support of its petition, and discussed it at the hearing before the trial court.

24

subd. (e).) Although the State Board's enforcement policy defines "avoided costs" and "delayed costs" in a manner that may be ascertained by reference to "objective" criteria (see fn. 12, *ante*), the policy also more broadly refers to the State Board's consideration of "any other economic benefits" gained by the discharger.[24] We therefore reject Appellants' position that only "objective" costs need be considered by the State Board as unduly restrictive and inconsistent with the statutory liability scheme.

We also reject Appellants' argument that, because inability to pay is a *defense* to the imposition of civil liability and a factor used to mitigate or reduce the penalty amount, their financial information is not relevant at this investigative stage. Appellants contend their financial information only becomes relevant if they choose to assert an inability to pay defense to challenge the proposed ACL complaint and recommended penalty amount, and they further choose to proffer these financial records in connection with an eventual administrative hearing. The fact that Appellants' financial documents are relevant to such a defense does not mean they are not relevant to the State Board's investigation and its initial determination of the proposed liability amount which must be

---

[24]    As an example of financial information that may have bearing on "other economic benefits" gained by the discharger, the State Board posits that the subpoenaed documents may reveal Appellants "avoided interest costs and realized profits sooner by building and selling homes more quickly, which was accomplished by [p]ermit noncompliance."

pleaded in the ACL complaint (Wat. Code, § 13323, subd. (a)).[25] We reject Appellants' suggestion that their financial records only become relevant if they elect to raise an inability to pay defense. (See *N.L.R.B. v. N. Bay Plumbing* (9th Cir. 1996) 102 F.3d 1005, 1009 [rejecting claim that subpoenas were overbroad in that they only seek information regarding a party's defenses].) Relevance for purposes of evaluating investigative subpoenas is not that narrow. (*Ibid*. [" '[A] subpoena is proper even when it is designed to produce material concerning a defense that may never arise; the focus is on relevancy to the investigation, not relevancy to the issues at the hearing.' "].)

Finally, we reject Appellants' argument that principles of deterrence do not support the State Board's request for Financial Documents in this case. Appellants state that "no deterrence factor" exists in the State Board's enforcement policy and, instead, the entire "ten-step methodology . . . is designed to function collectively for deterrence purposes." We are not persuaded that this distinction is material. The enforcement policy specifically states that the State Board should impose a penalty amount that will "[d]eter the specific person(s) identified in the ACL from committing further violations," and "[d]eter similarly situated person(s) in the regulated community from committing the same or similar violations." (See fn. 11, *ante*.) The enforcement policy also emphasizes that the State Board should propose an amount that ensures "liabilities are not construed

---

[25] The enforcement policy contemplates that the proposed liability amount and "significant considerations regarding the liability amount" should be discussed in the ACL complaint and in any order imposing ability. (See fn. 11, *ante*.) The subpoenaed Financial Documents may assist the State Board's efforts to prepare the ACL complaint and to prepare for any future administrative hearing.

as the cost of doing business and that the assessed liability provides a meaningful deterrent to future violations." (*Ibid*.) We disagree with Appellants' position that something more specific is required to establish that their financial records are relevant to the State Board's investigation and its objective of determining what civil liability amount will have the necessary deterrent effect under the relevant statutory framework. (See *Kelly v. United States E.P.A.* (7th Cir. 2000) 203 F.3d 519, 523 ["Civil penalties under the Clean Water Act are intended to punish culpable individuals and deter future violations, not just to extract compensation or restore the status quo."]; see also *Municipal Authority*, *supra*, 150 F.3d at pp. 263-264 [although the Clean Water Act does not define the term "economic benefit," "[i]t is apparent . . . that the goal of the economic benefit analysis is to prevent a violator from profiting from its wrongdoing"]; *United States v. Smithfield Foods* (E.D.Va.1997) 972 F.Supp. 338, 348 ["Courts use economic benefit analysis to level the economic playing field and prevent violators from gaining an unfair competitive advantage."].)

In sum, we conclude that the challenged subpoenas were sufficiently definite, and the information sought was reasonably relevant to the State Board's authorized investigation. The trial court properly enforced the subpoenas pursuant to the State Board's petition.

## III.

### *Asserted Privacy Rights and Protective Order*

A.  *Additional Background*

As noted *ante*, Appellants refused to produce responsive financial documents based on their right to privacy.  In response to these asserted privacy claims, the trial court allowed Appellants to withhold their tax returns but required them to produce the balance of the subpoenaed records.

The trial court also issued a protective order which limits the use of certain documents produced in response to the State Board's subpoenas:[26]  "The [State Board] may use the Protected Material to prosecute, defend, or attempt to settle any ACL action filed related to any phase of the Project, should any Respondent named as a responsible party in any ACL action assert a defense to which the Protected Material may be relevant. Under such a circumstance, the [State Board] may rely on the Protected Materials to rebut any such defense."[27]  (Fn. omitted.)

---

[26]    The protective order defines "Protected Material" as documents "that qualify for protection under the United States Constitution, California Constitution, and all other applicable laws of the State of California."

[27]    The protective order further states:  "Respondents will produce all responsive documents consistent with the Court's order, and the Water Boards will remove Protected Material from any administrative record arising from an ACL action, including from any decision issued by the Regional Board, unless or until a named Respondent submits such Protected Material in the administrative proceedings.  If the Regional Board determines Protected Material is necessary to justify its findings under *Topanga Assn. for a Scenic Comm. v. County of Los Angeles* (1974) 11 Cal.3d 506, such Protected Material will be submitted in camera."

B. *Analysis*

Appellants claim that compelling disclosure of their financial documents violates their right to privacy and, because the subpoenaed records are not relevant to the State Board's investigation, "no basis exists to overcome" their significant privacy interests. We reject Appellants' claim that the trial court erred in balancing any assumed privacy rights in this case.

As already discussed, the investigative subpoenas challenged in this appeal satisfy the three-part test established in *Brovelli*. Appellants contend (without citation to authority) that some type of heightened standard should apply here,[28] and that "[i]n this unusual circumstance of a governmental agency demanding records unrelated to the subject matter of its investigation and also unrelated to the subject area of its regulatory powers, no basis exists to overcome significant privacy interests and compel disclosure." But we already have rejected the premise of Appellants' argument by concluding that the subpoenaed Financial Documents *are reasonably relevant* to the State Board's investigation. We also reject Appellants' claim that a heightened standard applies. The Supreme Court in *Brovelli* established guidelines for determining the permissible scope of investigative subpoenas, even when faced with constitutional concerns such as unreasonable searches and seizures. (*Brovelli*, *supra*, 56 Cal.2d at p. 529 ["Insofar as the prohibition against unreasonable searches and seizures can be said to apply at all it

---

28      Specifically, Appellants claim that "application of the privacy standard overlaps with—or extends and heightens—the baseline standard that the records be 'pertinent to the subject matter of the investigation' or 'reasonabl[y] relevant to the investigation.' "

requires only that the inquiry be one which the agency demanding production is authorized to make, that the demand be not too indefinite, and that the information sought be reasonably relevant."].) We see no basis for applying a more stringent standard here merely because Appellants assert a privacy right in the subpoenaed records.

Assuming without deciding that Appellants have privacy interests in the subpoenaed Financial Documents,[29] the trial court did not err in granting the State Board's petition to compel compliance with the investigative subpoenas. In *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1 (*Hill*), our Supreme Court "established a framework for analyzing constitutional invasion of privacy claims." (*County of Los Angeles v. Los Angeles County Employee Relations Com*. (2013) 56 Cal.4th 905, 926; see *Williams v. Superior Court* (2017) 3 Cal.5th 531, 552-553 [the *Hill* framework has been applied broadly in balancing privacy claims].) "If an obvious invasion of interest fundamental to personal autonomy is involved, then the compelling interest test applies. If the invasion is less central, or is in bona fide dispute, then a general balancing test applies." (*Fair Employment & Housing*, *supra*, 99 Cal.App.4th at p. 903, citing *Hill*, at p. 34.)

---

[29] See *Conn. Indem. Co. v. Superior Court* (2000) 23 Cal.4th 807, 817 [assuming without deciding that corporate entities have constitutional and statutory privacy rights but citing *Roberts v. Gulf Oil Corp.* (1983) 147 Cal.App.3d 770, 791-793 for its holding that "corporate entities have no privacy rights under art. I, § 1 of the Cal. Const."]; *Hecht, Solberg, Robinson, Goldberg & Bagley LLP v. Superior Court* (2006) 137 Cal.App.4th 579, 595 [assuming without deciding that artificial entity or partnership has privacy rights].

30

We conclude the trial court properly balanced the competing interests here. Although Appellants assert the trial court did not adequately explain the basis for its ruling, it is clear from the record that the trial court considered the scope of the subpoena requests and Appellants' relevancy and privacy concerns, balanced the competing interests, and carefully exercised its discretion in compelling production of responsive documents subject to a protective order.[30] For reasons already discussed *ante*, in applying the *Brovelli* test, the State Board has a legitimate and important interest in obtaining Appellants' Financial Documents to aid in its investigation. (*Hill*, *supra*, 7 Cal.4th at p. 38.) Appellants have not shown any error on this record. (See *Tom v. Schoolhouse Coins* (1987) 191 Cal.App.3d 827, 830 (*Tom*) [compelling production of various business records, including complete customer list with customers' identities, where there was "a sufficiently compelling governmental interest in identifying and rectifying violations of the securities laws to justify the de minimus intrusion" on any privacy interests held by the customers]; see also *Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 6, 24 [peer review records that were protected by statute and not subject to discovery were nonetheless subject to disclosure in response to an investigative subpoena].)

---

[30] For example, the trial court stated that the financial documents are relevant to an assessment of the economic benefits derived from the alleged violations, as well as an assessment of the economic health of the violator (relevant to ensure "its ability to continue its business" (Wat. Code, § 13385, subd. (e)), and a general view of the violator's profits. The court further stated that the State Board would need "to know how much they [the violator] benefitted" and "how did they shield their economics from that," and that the agency's investigative needs were "sufficiently broad to really give some leeway in the subpoenas for every single record [the State Board is] asking for except for the tax records."

The subpoena process itself guarantees limited use and precludes unauthorized disclosure of Appellants' financial information. (Gov. Code, §§ 11181, subds. (g) & (h), 11183; *Tom*, *supra*, 191 Cal.App.3d at p. 830 [financial privacy interest was "adequately protected by Government Code section 11183, which makes it a misdemeanor for any public officer to divulge information pertaining to the 'confidential or private transactions, property or business of any person' acquired pursuant to the investigative authority conferred by Government Code sections 11180 and 11181"].)[31] And the trial court provided additional protections when it issued a protective order. (See *City and County of San Francisco v. Uber Technologies, Inc.* (2019) 36 Cal.App.5th 66, 84 (*Uber*) [rejecting "Uber's contention that the trial court's order should be reversed on the basis that the administrative subpoenas invade the privacy and confidentiality interests of Uber or third parties," where a protective order was in place].)

Appellants have not shown that the confidentiality provisions in the protective order are insufficient to protect their interests. (*Uber*, *supra*, 36 Cal.App.5th at p. 83 [it is the burden of the party responding to the administrative subpoena to demonstrate the protective order entered by the court is inadequate to protect its assumed privacy interests].) Appellants claim the protective order provides illusory protection because the

---

[31]     Certain information obtained during the investigation may be divulged to the Attorney General, any federal or state prosecutor, or any other agency responsible for enforcing laws related to the activity being investigated "if the Attorney General, prosecuting attorney, or agency to which the information or evidence is divulged agrees to maintain the confidentiality of the information received." (Gov. Code, § 11181, subd. (g).)

32

financial documents disclosed pursuant to the subpoenas may not fall within the protective order's definition of protected material.  At a hearing on the matter, when addressing this concern, a representative from the State Board affirmed that all financial documents produced pursuant to the subpoenas would "absolutely" be considered protected material under the protective order.[32]

We therefore conclude Appellants have not demonstrated the existing statutory protections and protective order do not adequately protect their assumed privacy interests in the subpoenaed information.

IV.

*Certificate of Interested Entities or Persons and Request for Judicial Notice*

California Rules of Court, rule 8.208(e) requires parties to serve and file a certificate identifying entities or persons with financial or other interests in the outcome of the case (certificate).[33]  The purpose of the certificate "is to provide justices of the

---

[32]     Should the State Board take a contrary position in the future, or should other disputes arise regarding enforcement of the protective order, the parties may seek relief from the trial court.  The protective order provides that persons agreeing to be bound thereby must further agree to submit to the jurisdiction of the San Diego Superior Court for the purpose of enforcing the protective order's terms.  (See *Uber*, *supra*, 36 Cal.App.5th at p. 84.)

[33]     See California Rules of Court, rule 8.208(e)(2) ["If a party knows of any person or entity, other than the parties themselves, that has a financial or other interest in the outcome of the proceeding that the party reasonably believes the justices should consider in determining whether to disqualify themselves under canon 3E of the Code of Judicial Ethics, the party's certificate must list that entity or person and identify the nature of the interest of the person or entity."].  Additional rule citations are to the California Rules of Court.

Courts of Appeal with additional information to help them determine whether to disqualify themselves from a proceeding." (Rule 8.208(a).) Appellants' certificate was filed conditionally under seal pursuant to rule 8.208(d)(2), which authorizes filing the certificate under seal "[i]f the identity of any party or any entity or person subject to disclosure . . . has not been publicly disclosed in the proceedings and a party wants to keep that identity confidential."[34]

The State Board filed two documents—an opposition brief and a request for judicial notice—which pertain to the conditionally-sealed certificate. In its opposition, the State Board contends the request to seal is Appellants' "latest attempt to subvert the [State Board's] investigation by hiding potential additional businesses and/or individuals who should be subject to examination," and to "conceal the identity of other potential[ly] responsible parties." In its request for judicial notice, the State Board contends documents filed in Los Angeles and Orange County superior courts may show that the information (or at least some of it) in Appellants' certificate is not confidential, and therefore should not be filed under seal. The State Board requests that Appellants not be allowed to file the certificate under seal or, alternatively, that this court order Appellants to disclose the certificate to the State Board and Attorney General if we affirm the trial court's order on appeal.

---

[34]   Appellants submitted an attorney declaration stating that none of the interested persons or entities listed on the certificate has been publicly disclosed in this proceeding. However, the declaration does not state that the information in the certificate is, in fact, confidential.

We grant the State Board's unopposed request for judicial notice,[35] and we reverse the conditional order to seal. Proceedings in the courts are presumptively public, and this presumption is overcome only with a showing sufficient to override the public interest in public access. (Code Civ. Proc., § 124; *NBC Subsidiary* (*KNBC-TV*), *Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1181-1182, 1217-1218.) Appellants aver that this appeal "involves [the State Board's] efforts to use investigative subpoenas to identify Appellants' confidential ownership structure and financial information," and state that they seek to preclude the State Board from accessing the certificate because it contains "the very information Appellants[] seek to protect from disclosure in this appeal." This is not a legitimate reason to override the presumptive right of public access, especially in light of our denial of the relief Appellants sought on appeal. Therefore, having reconsidered Appellants' request to file their certificate under seal, we reverse the conditional sealing order and deny Appellants' request to file their certificate under seal.

---

[35] The records are subject to judicial notice. (Evid. Code, §§ 452, subd. (d), 459.) The State Board requests that we take judicial notice of the same records for another purpose—namely, to "establish the reasonable relevancy of the subpoenaed financial documents to the investigation and potential ACL action"—but the record before us is sufficient and we need not consider the documents for this additional purpose.

DISPOSITION

The order is affirmed.


GUERRERO, J.

WE CONCUR:


McCONNELL, P. J.


BENKE, J.

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| STATE WATER RESOURCES CONTROL BOARD,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BALDWIN & SONS, INC. et al.,<br><br>    Defendants and Appellants. | D075617<br><br><br><br>(Super. Ct. No. 37-2018-00048033-CU-PT-CTL)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed January 16, 2020, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P. J.

Copies to: All parties